FRANK A. WEISER, (Bar No. 89780)
LAW OFFICES OF FRANK A. WEISER
3460 Wilshire Blvd., Ste. 1212
Los Angeles, California 90010
Tel: (213) 384-6964
Fax: (213) 383-7368
E-Mail: maimons@aol.com

Attorneys for Plaintiffs
MS & SONS HOSPITALITY, LLC;
a California Limited Liability
Company, and MUKESH H. PATEL

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MS & SONS HOSPITALITY, LLC, a California Limited Liability Company; MUKESH K. PATEL, <br><br><br> Plaintiffs, <br><br> vs. <br><br> SEOUL PLAZA, LLC, a Washington Limited Liability Company; AND DOES 1 THROUGH 10 INCLUSIVE, <br><br> Defendants. | Case No. <br><br> **COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF** |

1

Plaintiffs MS & SONS HOSPITALITY, LLC; a California Limited Liability Company, and MUKESH H. PATEL (collectively "Plaintiffs," or "MS," or "MP") hereby file the following Complaint and state and allege as follows:

## JURISDICTION AND VENUE

1.     Jurisdiction of the federal court exists pursuant to 28 U.S.C. Section 1332 and 28 U.S.C. Section 1343 (a)(3). This action, which arises under the laws and Constitution of the United States, and involves violations of California state law

2.     Venue is proper in this District pursuant to 28 U.S.C. Section 1391(b) in that Plaintiffs reside in this District and the claims arose in this District.

## PARTIES

3.     Plaintiff MS is a California Limited Liability Company duly formed and existing under the laws of the State of California and is the the legal owner of real property and a motel operating on such property commonly known as the MOTEL 6 - THOUSAND PALMS ("Property," or "Motel") at 72215 Varner Road, Thousand Palms, CA 92276..

4.     Plaintiff MP is a authorized managing member of MS and sues in this case individually and as a managing member on behalf of MS.

5.     Plaintiffs allege that Defendant SEOUL PLAZA, LLC, a Washington Limited Liability Company ("SEOUL"); is a limited liability company formed and existing under the laws of the State of Washington and duly authorized to do business in the County of Riverside and the State of California. .

6.     The true names and capacities, whether individual, corporate, associate or otherwise, herein named as DOES 1 through 10, and persons heretofore unknown involved in the actions taken against plaintiffs are unknown to him at this time. Plaintiffs are informed and believe and based thereon alleges that each of the DOE defendants are responsible in some manner for the occurences herein referred to, and that plaintiffs' injuries and damages as herein alleged were proximately caused by those defendants. Plaintiffs sue said defendants by such fictitious names and will amend this complaint when such names are actually known.

## FACTUAL HISTORY

7.     Plaintiffs allege that PINNACLE HOSPITALITY, INC., a California Corporation ("PINNACLE"); is a corporation formed and existing under the laws of the State of California and duly authorized to do business in the County of Riverside and the State of California.

8.     Plaintiffs allege that JAMES CHOI and SUSAN CHOI, are husband and wife, and members of SEOUL and PINNACLE residing in the County of Los Angeles, and their son CHRIS CHOI ("J. CHOI," "S. CHOI," "C. CHOI," or collectively "CHOI") , is a member of SEOUL and PINNACLE residing in the County of Riverside .

9     MS purchased the property in or about June 1, 2017 from SEOUL PLAZA, LLC, a Washibgton Limited Liability Company ("SEOUL"). which was operating the property as a motel commonly known as RED ROOF INN ("RRI") by way of PINNACLE The principal owners and operators of SEOUL and PINNACLE were the same individuals J. CHOI, S. CHOI and their son CHRIS CHOI (collectively "CHOI"). MS in purchasing the property from SEOUL also purchased the RRI from PINNACLE.

10.     During the escrow period for the purchase of the motel, on April 24, 2017, extensive water damage occurred at the motel that caused damage to the entire property by way of the water intrusion, including both the exterior and interior of the motel. Damage occurred to the motel's roof, exterior stucco, interior carpet and carpet padding, interior vinyl flooring, and interior ceiling and walls. The motel was a total loss due to the water intrusion, requiring a complete remodel and renovation of the motel property.

11.     Due to the damage, the escrow instructions were amended between MS and SEOUL.

12.     On or about May 31, 2017 and May 25, 2017, SEOUL entered into amended escrow instructions with MS agreeing that the property was owned by SEOUL and the business was owned by PINNACLE. The instructions provided that SEOUL and PINNACLE would repair and return the property to its original condition and repair the water damage.

13.     A copy of the original purchase agreement entered into between MP and SEOUL dated October 18, 2016 to purchase the property is attached hereto as Exhibit "A".

14.     A copy of the original escrow instructions entered into between MP and PINNACLE dated January 19, 2017 to purchase the property is attached hereto as Exhibit "B"

15.     A copy of the amended  escrow instructions entered into between MP and SEOUL, PINNACLE dated April 10, 2017, substituting SEOUL in place of PINNACLE as the seller of the property is attached hereto as Exhibit "C".

16.     During the escrow period MP assigned and named MS as the purchaser of the property.

4

17.     A copy of the amended escrow instructions entered into between MS, SEOUL and PINNACLE referred to in paragraph 10 is attached hereto as Exhibit "D".

18.     SEOUL and PINNACLE also maintained insurance through DB INSURANCE CO. LTD. ("DB") for the property that insures the damage to the property.

19.     During the escrow period and prior to plaintiffs taking title to the property and RRI, SEOUL made an insurance claim with DB through its operating entity PINNACLE for business income loss and property loss, including restoration of the motel units damaged including the contents,  through its insurance policy for the property. PINNACLE is the named insured on the insurance policy for the property with DB.

20.     On or about February 21, 2018, CHOI and PINNACLE retroactively assigned all of its rights under the insurance policy on the property with DB, including the property loss, restoration of the motel units damaged including the contents and the business income claim, to MS to coincide with the transfer of the property on June 1, 2017.

21.     On or about May 9, 2018, DB refused to recognize as valid the  assignment referred to in paragraph 20 with respect to the business income claim.

22.     On or about August 7, 2018, DB's counsel, LEWIS BRISBOIS BISGAARD & SMITH LLP ("LBBS") wrote and delivered a letter to PINNACLE by way of CHOI and to plaintiffs ("Letter").

23.     In the letter, LBBS discussed the claim made by PINNACLE and stated that it was aware that CHOI informed to DB's agent, AL RAMIREZ ("RAMIREZ") of YORK RISK SERVICES ("YORK") that "[t]he new owner/assignee was identified in Mr. Choi's letter as MS & Sons Hospitality, LLC." (emphasis added).

5

24.     In the letter, LBBS went on to state, "[o]n May 9, 2018 we wrote to Mr. Choi, MS & Sons LLC, and the Greenspan Company to advise you that under California law, while other post-loss benefits may be transferred to a new owner, the policy's **business interruption and loss of income benefits are only transferable with the express approval of the insurer.**" (emphasis added).

25.     While DB did not recognize the assignment with respect to the business income claim it did recognize the assignment and partially paid on the claim for restoration of the motel units.

26.     For example, prior to to the letter sent by LBBS, on or about May 1, 2018, GREENSPAN COMPANY ("GREENSPAN"), an insurance adjusters company, was hired by plaintiffs to act as an agent for plaintiffs in securing payment from DB regarding the claim.

27.     Subsequent to the letter sent by LBBS, on or about November 1, 2018, DB requested that plaintiffs provide a sworn statement in partial proof of loss regarding the replacement cost of damage to the motel and motel units.

28.     Pursuant to DB's request set forth in paragraph 27 above, on or about November 14, 2018, plaintiff MP on behalf of plaintiffs provided a sworn statement in partial proof of loss regarding the replacement cost of damage to the motel and motel units. The statement form that MP provided to DB was filled out by DB and MP only had to sign and have the form notarized.  ("Statement of Loss").

29.      In the Statement of Loss, DB by way of YORK, filled out at paragraph 4, **"4. Changes. Since the said policy was issued there has been no assignment thereof, or change of interest, use occupancy possession location or exposure of the property described except: Pinnacle Hospitality LLC sold the property to Motel 6 Thousand Palms."** (emphasis added).

30.      Pursuant In the Statement of Loss provided to DB a claim for $103,266.14 for remaining replacement costs for repair to one of the buildings of the motel which was damaged along with the motel units was paid by DB to plaintiffs.This building has 31 motel units which was fixed by plaintiffs due to the partial payment by DB on the claim for replacement costs for repair damage to the motel and 31 motel units in the approximate amount of $605,212.49.

31.      At all times relevant herein, the motel consisted of 116 motel units of which 85 motel units are located at two additional buildings damaged by the water damage and still require extensive repair and which DB has refused and continues to refuse to pay plaintiffs on such claim.

32.      DB also refused and  to pay on the claim as to the loss of contents in the units which includes the fiztures and improvements in the motel units..

33.      Further, when on February 21, 2018, PINNACLE retroactively assigned all of its rights under the insurance policy on the property with DB to MS, as set forth in paragraph 20  above, the assignment was addressed and delivered to RAMIREZ.

34.     Prior to the assignment, subsequent to when plaintiffs took title and operation of the property and motel on June 1, 2017, and subsequent to the assignment, RAMIREZ met with plaintiffs on multiple occassions at the motel to assess the damage and work that was being done to repair the motel and scknowledged that DB understood that plaintiffs were the new owners and operastors of the motel and that they had been assigned the claim set forth in paragraph 20 above by CHOI and PINNACLE.

35.     On or about September 28, 2017, YORK wrote and delivered a letter to PINNACLE informing them that under the insurance policy provisions, the replacement costs to the motel units and the fixtures and improvements in the motel units were covered under the policy

36.     To date, the property has not been repaired to its original condition and DB has failed to timely pay contractors to restore the remaining motel units; and failed to pay on the losses of the contents, fixtures and improvements in the motel units; and failed to pay on the business income losses to plaintiffs; and as a result, plaintiffs have been damaged in an amount according to proof at trial but well over $2,000,000.00.

37.     To date, the Defendant, SEOUL,  has failed and refused to indemnify Plaintiffs for the losses that DB has illegally refused to pay on the basis of the assignment as set forth in paragraphs 7-36, and as a result, plaintiffs have been damaged in an amount according to proof at trial but well over $2,000,000.00.

Based on the above facts, Plaintiffs allege the following claims:

## FIRST CLAIM FOR RELIEF

### (Breach of Contract and Express Indemnity

### by All Plaintiffs Against All Defendants)

38.  Plaintiffs reallege and incorporate herein by reference to each and every allegation contained in Paragraphs 1 through 37, and all its subparts, inclusive, as set forth hereinabove.

39.   As a direct result of the Defendants, and each of them, failure to indemnify for the losses that DB has illegally refused to pay on the basis of the assignment,  the Defendants, and each of them, have breached the contract entered into with Plaintiffs.

40.   As a proximate result of the foregoing acts of Defendants, and each of them, Plaintiffs have suffered  extreme hardship and damages, which damages include, but is not limited to, economic damages, lost profits as the property sits uninhabitable and unusable; onging fees and costs to prevent further damage to the property while the property is exposed to the elemements; attorney's fees and costs; and other economic and consequential damages according to proof at trial, but  not less than $2,000,000.00; and to appropriate declaratory and injunctive relief, against all the Defendants, and to their reasonable attorneys fees.

## SECOND CLAIM FOR RELIEF

### (Breach of Implied Indemnity

### by All Plaintiffs Against All Defendants)

41.   Plaintiffs reallege and incorporate herein by reference to each and every allegation contained in Paragraphs 1 through 40, and all its subparts, inclusive, as set forth hereinabove.

42.    As a direct result of the Defendants, and each of them, failure to indemnify for the losses that DB has illegally refused to pay on the basis of the assignment, the Defendants, and each of them, have breached the covenant of an implied duty of indemnity arising out of the contract entered into with Plaintiffs.

43.    As a proximate result of the foregoing acts of Defendants, and each of them, Plaintiffs have suffered  extreme hardship and damages, which damages include, but is not limited to, economic damages, lost profits as the property sits uninhabitable and unusable; onging fees and costs to prevent further damage to the property while the property is exposed to the elemements; attorney's fees and costs; and other economic and consequential damages according to proof at trial, but  not less than $2,000,000.00; and to appropriate declaratory and injunctive relief, against all the Defendants, and to their reasonable attorneys fees.

WHEREFORE,  Plaintiffs pray judgment against Defendants, and each of them, as follows:

## FIRST CLAIM FOR RELIEF

1. For damages according to proof at trial; but not less than $2,000,000.00

2. For appropriate declaratory and injunctive relief;

3. For attorney's fees;

4. For costs of suit; and

## SECOND CLAIM FOR RELIEF

5. For damages according to proof at trial; but not less than $2,000,000.00

6. For appropriate declaratory and injunctive relief;

7. For attorney's fees;

8. For costs of suit;

## FOR ALL CLAIMS FOR RELIEF

9. For such other and further relief as the Court

deems just and proper.

DATED: May 27, 2021                     LAW OFFICES OF FRANK A. WEISER


By: _Frank A. Weiser_____
FRANK A. WEISER, Attorney for
Plaintiffs MS & SONS HOSPITALITY,
LLC; a California Limited Liability
Company, and MUKESH H. PATEL

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial pursuant to F.R.C.P. 38.

DATED: May 27, 2021

LAW OFFICES OF FRANK A. WEISER

By: _____
FRANK A. WEISER, Attorney for
Plaintiffs MS & SONS HOSPITALITY,
LLC; a California Limited Liability
Company, and MUKESH H. PATEL

12

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**EXHIBIT "A"**

# Marcus & Millichap

## PURCHASE AGREEMENT

**THIS DOCUMENT IS MORE THAN A RECEIPT FOR MONEY. IT IS INTENDED TO BE A LEGALLY BINDING AGREEMENT. READ IT CAREFULLY.**

__Mukesh (Mike) Patel and/ or assignee_____ shall be hereafter referred to as "Buyer".

__Seoul Plaza Inc_____ shall be hereafter referred to as "Seller".

Buyer shall deliver to Escrow Holder as defined in Paragraph 3 or to Marcus & Millichap Real Estate Investment Services ("Agent"), as agent for ⌐ Seller ☑ Buyer ⌐ Seller and Buyer the sum of **Twenty Five Thousand** dollars ($ **25,000** ) in the form of **check** . This sum is a deposit ("Deposit") to be applied to the purchase price of that certain real property (referred to as the "Property") located in the City of **Thousand Palms** , County of **Riverside** , State of **California** , and more particularly described as follows:

**Red Roof Inn**
**72215 Varner Rd,**
**Thousand Palms, CA 92276**

**116 Rooms**
**APN # 650-090-027**

**Purchase includes all of Seller's rights, title and interest, together with leases, contracts, signage, billboards, all transferable licenses or permits ( Including Liquor License ) and all associated buildings, improvements, parking, furniture, fixtures, fittings, and owned equipment, all motel inventory (consisting of linens, paper goods, cleaning and operating supplies) now in, owned and used in the operation of the facility, historical business and marketing records in existence on the Closing Date.**

**The Purchase Price includes the name currently used i.e. Red Roof Inn, Palm Springs-Thousand Palms,CA. Seller agrees to execute any documents required to transfer to the Buyer the telephone numbers, web sites, etc presently in use by the property, along with any other business related services although not specifically listed herein.**

**The sale shall not include any cash (house bank, operating bank accounts, etc.), accounts receivable, proceeds thereof or other rights to the payment of money arising out of operations prior to closing, nor any accounts payable or other non-recurring liabilities of the Seller, nor cost of re-sale inventory in the store.**

## TERMS AND CONDITIONS

Seller agrees to sell the Property, and Buyer agrees to purchase the Property, on the following terms and conditions:

J.P  *S.K Million Two Hundred Thousand*

200,000  **PURCHASE PRICE:** The purchase price for the Property is ~~Five Million Seven Hundred Thousand~~ dollars ($ ~~5,700,000~~ ). Buyer's Deposit, pending Seller's execution of this Purchase Agreement (the "Agreement"), shall be delivered directly to the Escrow Company indicated in Paragraph 3 of this Agreement, by check or wire, upon mutual execution of this Agreement. Agent shall deliver and deposit same in escrow as provided in Paragraph 3 below. The balance of the purchase price shall be payable at close of escrow pursuant to the terms stated below.

2) **DOWN PAYMENT:** A) Buyer shall make a cash down payment of _____ dollars ($_____ ) or B) **25% of the purchase price** .

0612

*Hanmi Escrow*

3)  **ESCROW:** Within ~~five~~ ( 5 ) calendar days after the Effective Date (as defined in a separate paragraph below) **agent** shall open escrow with ~~First American Title Company~~ (the "Escrow Holder") by the simultaneous deposit of a copy of this Agreement and Buyer's Deposit with the Escrow Holder.

Seller and Buyer agree to prepare and execute such escrow instructions as may be necessary and appropriate to close the transaction. Close of escrow (or the "Closing Date," which shall mean the date on which the deed transferring title is recorded) shall occur within **Ninety** ( 90 ) calendar days of the Effective Date of this Agreement (as defined in paragraph 38 below). Escrow fee shall be paid by **Buyer and Seller 50/50** . County transfer taxes shall be paid by **seller** . City transfer taxes, if any, shall be paid by **seller** . All other closing costs shall be paid as follows **in accordance with the custom in the county in which the property is located** .

4)  **PRORATIONS:** Real property taxes, premiums on insurance acceptable to Buyer, interest on any debt being assumed or taken subject to by Buyer, and any other expenses of the Property shall be prorated as of the Closing Date. Security deposits, advance rentals, and the amount of any future lease credits shall be credited to Buyer. The amount of any bond or assessment which is a lien and not customarily paid with real property taxes shall be (select one "X") ____ paid by seller or **X** assumed by buyer. Delinquent or unpaid rents and C.A.M. reconciliations shall be handled outside of escrow and neither Agent nor escrow shall be responsible for same. Buyer agrees to assume any existing laundry lease, if applicable to the Property.

LEASED PROPERTY PRORATIONS: Rents actually collected (prior to closing) will be prorated as of the Closing Date and rent collected thereafter applied first to rental payments then owed the Buyer and their remainder paid to the Seller. All free rent due any tenant at the close of escrow for rental periods after the closing shall be a credit against the Purchase Price. Other income and expenses shall be prorated as follows: **as of 12 noon on the closing date** .

5)  **TITLE:** Within **seven** ( 7 ) calendar days after the Effective Date of this Agreement, Seller shall procure and cause to be delivered to Buyer a preliminary title report with copies of all exceptions issued by **First American Title Company** (the "Title Company") on the Property. Within **fourteen** ( 14 ) calendar days following the Effective Date, Buyer shall either approve in writing the exceptions contained in said title report or specify in writing any exceptions to which Buyer reasonably objects. If Buyer objects to any exceptions, Seller shall, within **twenty one** ( 21 ) calendar days following the Effective Date, deliver to Buyer written notice that either (i) Seller will, at Seller's expense, remove the exception(s) to which Buyer has objected before the Closing Date or (ii) Seller is unwilling or unable to eliminate said exception(s). If Seller fails to so notify Buyer or is unwilling or unable to remove any such exception by the Closing Date, Buyer shall elect in writing, within **twenty eight** ( 28 ) calendar days from the Effective Date to either terminate this Agreement and receive back the entire Deposit (in which event Buyer and Seller shall have no further obligations under this Agreement); or to purchase the Property subject to such exception(s).

Seller shall convey by grant deed to Buyer (or to such other person or entity as Buyer may specify) marketable fee title subject only to the exceptions approved by Buyer in accordance with this Agreement. Title shall be insured by a standard California Land Title Association owner's policy of title insurance issued by the Title Company in the amount of the purchase price with premium paid by **seller** .

6)  **FINANCING CONTINGENCIES:**

6a. ☑ NEW FIRST LOAN
6.1) **NEW FIRST LOAN:** Buyer agrees to use Buyer's best efforts, at Buyer's expense, to obtain a new first loan in the amount of **Four Million Four Hundred Seventy Five Thousand** dollars ($ 4,275,000 ), to bear interest at origination at not more than **Five and a quarter** percent ( 5.25 %) per year (select one "X") ____ fixed rate **X** other ____, payable monthly in an initial amount not to exceed **Twenty Three Thousand Six Hundred and Seven** dollars ($ 23,607 ), and to be amortized over not less than **thirty** ( 30 ) years, due in **thirty** ( 30 ) years, with any loan fee not to exceed **standard usda or sba fees** . Said loan shall be secured by a new first mortgage or deed of trust on the Property. Buyer shall submit a written application to obtain said loan to a bona fide lender within **ten** ( 10 ) calendar days of the Effective Date and shall authorize said lender to confirm in writing to Seller that lender has received said application. Seller and Buyer agree that the lender's production of loan documents shall satisfy the financing contingency. If Buyer applies for a loan as stated above and the lender refuses to finance the purchase, then this Agreement will be rendered null and void and Buyer's Deposit shall be returned to Buyer. *Buyer's Inf*

If Buyer fails to apply as required hereinabove or if Buyer fails to notify Seller in writing that Buyer has obtained such a loan within **seventy five** ( 75 ) calendar days of the Effective Date, then at ~~Seller's~~ option this Agreement shall be null and void, and the entire Deposit shall be returned to Buyer. Seller agrees to pay any prepayment penalties due on the existing loan(s).

*0613*

6b. ☐ PURCHASE SUBJECT TO FIRST

6c.   ⌐ PURCHASE WITH ASSUMPTION OF FIRST

6d.   ⌐ SELLER CARRIES BACK FIRST

6e.   ⌐ NEW SECOND

6f.   ⌐ PURCHASE SUBJECT TO SECOND

6g.   ⌐ PURCHASE WITH ASSUMPTION OF SECOND

6h.   ⌐ SELLER CARRIES BACK SECOND

6i.   ⌐ SELLER CARRIES BACK THIRD

6j.   ⌐ ALL INCLUSIVE PROMISSORY NOTE AND DEED OF TRUST

6k.   ⌐ SHORTFALL CLAUSE

6l.   ⌐ NO FINANCING CONTINGENCY — ALL CASH

6m.   ⌐ OTHER FINANCING

**7)   PEST CONTROL CONTINGENCIES:**

7a.   ⌐ Standard

7b.   ☑ NO PEST CONTROL CONTINGENCY - "AS IS"
7.1)   **NO PEST CONTROL CONTINGENCY - "AS IS":** Buyer has conducted Buyer's own investigation with regard to possible infestation and/or infection by wood-destroying pests or organisms and agrees to purchase the Property in its present condition. Buyer acknowledges that Buyer is not relying upon any representations or warranties made by Seller or Agent regarding the presence or absence of such infestation or infection.

**8)   INSPECTION CONTINGENCIES:**

8a.   ☑ BOOKS AND RECORDS
8.1)   BOOKS AND RECORDS: Seller agrees to provide Buyer with items <u>**a,b,c,f,g,h,I,j,k**</u> listed below within <u>**seven**</u> ( **7** ) calendar days following the Effective Date:

a.   All rental agreements, leases, service contracts, insurance policies, latest tax bill(s) and other written agreements, written code violations or other notices which affect the Property.

b.   The operating statements of the Property for the <u>**thirty six**</u> ( **36** ) calendar months immediately preceding the Effective Date hereof.

c.   For commercial properties, copies of whatever documents the Seller may have regarding the financial condition, business prospects or prospective continued occupancy of any tenant (including but not limited to financial statements, credit reports, etc.).

d.   ~~All notes and security instruments affecting the Property.~~

e.   ~~A complete and current rent roll, including a schedule of all tenant deposits and fees.~~

f.   A written inventory of all items of Personal Property to be conveyed to Buyer and included as part of the purchase price at close of escrow.

g.   A report paid for by Seller by <u>**a qualified provider**</u>, a professional provider, containing the Natural Hazard Disclosures (as defined below) concerning the Property. "Natural Hazard Disclosures" shall mean whether the Property is located within: (1) Special Flood Hazard Area; (2) Dam Failure Inundation Area; (3) Earthquake Fault Zone; (4) Seismic Hazard Zone; (5) High Fire Severity Area; and/or (6) Wildland Fire Area. Seller represents and warrants that, unless otherwise noted by Seller to Buyer in writing, Seller is unaware of any inaccuracies in the Natural Hazard Disclosures.

h.   Any and all documents, of any type or nature, that in any way reference the existence of mold or mold-related problems with the Property or any toxic substance on or about the Property.

i.   Any and all documents, of any type or nature, that in any way reference the existence of lead-based paint or lead-based paint problems with the Property.

j.   Any and all documents, of any type or nature, that in any way reference the existence of litigation affecting the property.: **ALTA Survey, Transient Occupancy Tax Returns for the previous twelve months, and any other documents as reasonably requested by buyer or buyer's lender** .

0614

CA Purch DS 040416 (3).docm          3 of 14     BUYER'S INITIALS *hrp*     SELLER'S INITIALS *LC*
                                                                      CA - Copyright Marcus & Millichap 2016

i.   Any and all documents, of any type or nature, that in any way reference the existence of lead-based paint or lead-based paint problems with the Property.

j.   Any and all documents, of any type or nature, that in any way reference the existence of litigation affecting the property.  **ALTA Survey, Transient Occupancy Tax Returns for the previous twelve months, Tax returns for the subject property for the previous three years and profit and loss statement for the year 2016 and any other documents as reasonably requested by buyer or buyer's lender** .

Buyer shall acknowledge receipt of these items in writing. Buyer shall have ~~twenty one~~ Forty five ( ~~21~~ 45 md ) calendar days following the Effective Date to review and approve in writing each of these items. If Buyer fails to approve these items within the specified time, this Agreement shall be rendered null and void, Buyer's entire deposit shall be returned, and Buyer and Seller shall have no further obligations hereunder.

8b. ☑ PHYSICAL INSPECTION
8.2) **PHYSICAL INSPECTION:** Buyer shall have **twenty eight** ( **28** ) calendar days following the Effective Date to inspect the physical condition of the Property, including, but not limited to the soil conditions and the presence or absence of lead-based paint, mold and other hazardous materials on or about the Property, and to notify the Seller in writing that Buyer approves same. If Buyer fails to approve the physical condition of the Property within the specified time, this Agreement shall be null and void and Escrow Holder is hereby authorized to return Buyer's entire deposit. Buyer and Seller shall have no further obligations hereunder.

8c. ☑ STATE AND LOCAL LAWS
8.3) **STATE AND LOCAL LAWS:** Buyer shall have **twenty eight** ( **28** ) calendar days following the Effective Date to investigate State and local laws to determine whether the Property must be brought into compliance with minimum energy conservation or safety standards or similar retrofit requirements as a condition of sale or transfer and the cost thereof, and to notify Seller that Buyer approves same. If approved by Buyer, Buyer shall comply with and pay for these requirements. If Buyer fails to approve these requirements, if any, within the specified time, this Agreement shall be rendered null and void, Buyer's entire Deposit shall be returned, and Buyer and Seller shall have no further obligations hereunder.

8d. ☐ TENANT FINANCIAL INFORMATION (Leased Properties)

8e. ☐ NO INSPECTION CONTINGENCY - "AS IS"

8f. ☐ OTHER INSPECTION

9)   ~~**DEPOSIT INCREASE:** Upon removal of the inspection contingencies set forth in paragraph(s) _____ hereof, Buyer shall deposit in Escrow sufficient funds to increase the Deposit to _____ dollars ($_____). The entire Deposit shall be credited to the purchase price at the close of escrow unless otherwise provided herein.~~

10)  **DEPOSIT TRANSFER:** Buyer's Deposit shall remain in escrow, until removal of the inspection contingencies set forth in paragraph(s) **5, 6.1, 7.1, 8.1, 8.2, 8.3, 41.1** hereof. Upon removal of said contingencies, Buyer's Deposit shall be delivered to escrow by Agent (if same has been held in trust by Agent); a grant deed duly executed by Seller, sufficient to convey title to Buyer, shall be delivered to escrow by Seller; and the Escrow Holder shall release immediately from escrow and deliver to Seller Buyer's entire Deposit (including increases, if any). Buyer acknowledges and agrees that, in the event Buyer defaults on this Agreement after removal of contingencies, Buyer's Deposit is non-refundable and is forfeited to Seller. Seller shall hold Buyer's Deposit subject to the remaining terms and conditions of this Agreement. If the Property is made unmarketable by Seller, or acts of God, or Seller should default on this Agreement, the Deposit shall be returned to Buyer and deed shall be returned to Seller. If Seller defaults on this Agreement after Seller has received the Deposit, Seller understands and agrees that Buyer's Deposit must be returned to Buyer immediately.

BUYER'S INITIALS _*Cnt*_   SELLER'S INITIALS _____

11)  **ESTOPPEL CERTIFICATE CONTINGENCY (Leased Properties):**

11a. ☐ Standard

11b. ☑ ESTOPPEL CERTIFICATES NOT APPLICABLE
11.2) **ESTOPPEL CERTIFICATES NOT APPLICABLE**

0615

Buyer shall acknowledge receipt of these items in writing. Buyer shall have **twenty one** ( **21** ) calendar days following the Effective Date to review and approve in writing each of these items. If Buyer fails to approve these items within the specified time, this Agreement shall be rendered null and void, Buyer's entire deposit shall be returned, and Buyer and Seller shall have no further obligations hereunder.

8b. ☑ PHYSICAL INSPECTION
8.2) **PHYSICAL INSPECTION:** Buyer shall have **twenty eight** ( **28** ) calendar days following the Effective Date to inspect the physical condition of the Property, including, but not limited to the soil conditions and the presence or absence of lead-based paint, mold and other hazardous materials on or about the Property, and to notify the Seller in writing that Buyer approves same. If Buyer fails to approve the physical condition of the Property within the specified time, this Agreement shall be null and void and Escrow Holder is hereby authorized to return Buyer's entire deposit. Buyer and Seller shall have no further obligations hereunder.

8c. ☑ STATE AND LOCAL LAWS
8.3) **STATE AND LOCAL LAWS:** Buyer shall have **twenty eight** ( **28** ) calendar days following the Effective Date to investigate State and local laws to determine whether the Property must be brought into compliance with minimum energy conservation or safety standards or similar retrofit requirements as a condition of sale or transfer and the cost thereof, and to notify Seller that Buyer approves same. If approved by Buyer, Buyer shall comply with and pay for these requirements. If Buyer fails to approve these requirements, if any, within the specified time, this Agreement shall be rendered null and void, Buyer's entire Deposit shall be returned, and Buyer and Seller shall have no further obligations hereunder.

8d. ☐ TENANT FINANCIAL INFORMATION (Leased Properties)

8e. ☐ NO INSPECTION CONTINGENCY - "AS IS"

8f. ☐ OTHER INSPECTION

9) **DEPOSIT INCREASE:** Upon removal of the inspection contingencies set forth in paragraph(s) **5,7.1,8.1,8.2,8.3 ,41.1** hereof, Buyer shall deposit in Escrow sufficient funds to increase the Deposit to **fifty thousand** dollars ($ **50,000** ). The entire Deposit shall be credited to the purchase price at the close of escrow unless otherwise provided herein.

10) **DEPOSIT TRANSFER:** Buyer's Deposit shall remain in escrow, until removal of the inspection contingencies set forth in paragraph(s) **5,6.1,7.1,8.1,8.2,8.3,41.1** hereof. Upon removal of said contingencies, Buyer's Deposit shall be delivered to escrow by Agent (if same has been held in trust by Agent); a grant deed duly executed by Seller, sufficient to convey title to Buyer, shall be delivered to escrow by Seller; and the Escrow Holder shall release immediately from escrow and deliver to Seller Buyer's entire Deposit (including increases, if any). Buyer acknowledges and agrees that, in the event Buyer defaults on this Agreement after removal of contingencies, Buyer's Deposit is non-refundable and is forfeited to Seller. Seller shall hold Buyer's Deposit subject to the remaining terms and conditions of this Agreement. If the Property is made unmarketable by Seller, or acts of God, or Seller should default on this Agreement, the Deposit shall be returned to Buyer and deed shall be returned to Seller. If Seller defaults on this Agreement after Seller has received the Deposit, Seller understands and agrees that Buyer's Deposit must be returned to Buyer immediately.

BUYER'S INITIALS _____ SELLER'S INITIALS _____

11) **ESTOPPEL CERTIFICATE CONTINGENCY (Leased Properties):**

11a. ☐ Standard

11b. ☑ ESTOPPEL CERTIFICATES NOT APPLICABLE
11.2) **ESTOPPEL CERTIFICATES NOT APPLICABLE**

12) **INDEPENDENT CONSIDERATION:** Notwithstanding anything to the contrary in this Agreement, Buyer and seller agree that One Hundred Dollars ($100.00) of the Deposit will be non-refundable and will be distributed to Seller upon any termination of this Agreement as full payment and independent consideration for Seller's performance under this Agreement ("Independent Consideration"). If this Agreement is properly terminated by the Buyer, subject to paragraph **5,6.1,7.1,8.1,8.2,8.3,41.1** above, the Deposit less the non-refundable portion will be promptly returned to Buyer and the parties will have no further rights or obligations under this Agreement except for any that expressly survive the termination of this Agreement.

0616

13) **SERVICE AND TENANT CONTRACTS/OTHER MATERIAL CHANGES:** After Buyer has removed all contingencies, Seller shall not, without the prior written consent of Buyer which cannot be unreasonably withheld, enter into any new service or tenant contracts that cannot be canceled with 30 days notice and without penalty. Seller shall not make any material changes to the Property, do any act, or enter into any agreements of any kind that materially changes the value of the Property or the rights of the buyer as they relate to the Property.

14) **PERSONAL PROPERTY:** Title to any personal property to be conveyed to Buyer in connection with the sale of the Property shall be conveyed to Buyer by Bill of Sale on the Closing Date free and clear of all encumbrances (except those approved by Buyer as provided above). The price of these items shall be included in the Purchase Price for the Property, and Buyer agrees to accept all such personal property in "as is" condition.

15) **CONDITION OF PROPERTY:** It is understood and agreed that the Property is being sold "as is"; that Buyer has, or will have prior to the Closing Date, inspected the Property; and that neither Seller nor Agent makes any representation or warranty as to the physical condition or value of the Property or its suitability for Buyer's intended use. "Property Condition" means each and every matter of concern or relevance to Buyer relating to the Property, including without limitation the financial, legal, title, physical, geological and environmental condition and sufficiency of the Property and all improvements and equipment thereon; applicable governmental laws, regulations, and zoning; building codes, and the extent to which the Property complies therewith; the fitness of the Property for Buyer's contemplated use; the presence of hazardous materials; title matters; and contracts to be assumed by Buyer.

Upon Buyer's satisfaction or waiver of the contingencies in Paragraph __5, 6.1, 7.1, 8.1, 8.2, 8.3, 41.1__, Buyer agrees, and represents and warrants that upon Closing Buyer will purchase the Property "as is" and solely on reliance on its own investigation of the Property. Seller had no obligation to repair, correct or compensate Buyer for any Property Condition, and upon closing, Buyer shall be deemed to have waived any and all objections to the Property Condition, whether or not known to Buyer. Upon Closing, Buyer hereby waives, releases, acquits, and forever discharges Seller, and Seller's agents, directors, officers, and employees to the maximum extent permitted by law from any and all claims, actions, causes of action, demands, rights, liabilities, damages, losses, costs expenses, or compensation whatsoever, direct or indirect, known or unknown, foreseen or unforeseen, that it now has or which may arise in the future on account of or in any way growing out of or connected with Property Condition. BUYER EXPRESSLY WAIVES ANY OF ITS RIGHTS GRANTED UNDER CALIFORNIA CIVIL CODE SECTION 1542, WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.

BUYER'S INITIALS _____   SELLER'S INITIALS _____

16) **RISK OF LOSS:** Risk of loss to the Property shall be borne by Seller until title has been conveyed to Buyer. In the event that the improvements on the Property are destroyed or materially damaged between the Effective Date of this Agreement and the date title is conveyed to Buyer, Buyer shall have the option of demanding and receiving back the entire Deposit and being released from all obligations hereunder, or alternatively, taking such improvements as Seller can deliver. Upon Buyer's physical inspection and approval of the Property, Seller shall maintain the Property through close of escrow in the same condition and repair as approved, reasonable wear and tear excepted.

17) **POSSESSION:** Possession of the Property shall be delivered to Buyer on Closing Date.

18) **LIQUIDATED DAMAGES:** By placing their initials immediately below, Buyer and Seller agree that it would be impracticable or extremely difficult to fix actual damages in the event of a default by Buyer, that the amount of Buyer's Deposit hereunder (as same may be increased by the terms hereof) is the parties' reasonable estimate of Seller's damages in the event of Buyer's default, and that upon Buyer's default in its purchase obligations under this Agreement, not caused by any breach by Seller, Seller shall be released from its obligations to sell the Property and shall retain Buyer's Deposit (as same may be increased by the terms hereof) as liquidated damages, which shall be Seller's sole and exclusive remedy in law or at equity for Buyer's default.

BUYER'S INITIALS _____   SELLER'S INITIALS _____

19) **SELLER EXCHANGE:** Buyer agrees to cooperate should Seller elect to sell the Property as part of a like-kind exchange under IRC Section 1031. Seller's contemplated exchange shall not impose upon Buyer any additional liability or financial obligation, and Seller agrees to hold Buyer harmless from any liability that might arise from such exchange. This Agreement is not subject to or contingent upon Seller's ability to acquire a suitable exchange property or effectuate an exchange. In the event any exchange contemplated by Seller should fail to occur, for whatever reason, the sale of the Property shall nonetheless be consummated as provided herein.

20) **BUYER EXCHANGE:** Seller agrees to cooperate should Buyer elect to purchase the Property as part of a like-kind exchange under IRC Section 1031. Buyer's contemplated exchange shall not impose upon Seller any additional liability or financial obligation, and Buyer agrees to hold Seller harmless from any liability that might arise from such exchange. This Agreement is not subject to or contingent upon Buyer's ability to dispose of its exchange property or effectuate an exchange. In the event any exchange contemplated by Buyer should fail to occur, for whatever reason, the sale of the Property shall nonetheless be consummated as provided herein.

21) **DISCLOSURE OF REAL ESTATE LICENSURE:**

21a. ☐ License disclosure

21b. ☐ License disclosure

22) **AUTHORIZATION:** Buyer and Seller authorize Agent to disseminate sales information regarding this transaction, including the purchase price of the Property.

23) **AGENCY DISCLOSURE:**

23a. ☐ **EXCLUSIVE LISTING**

23b. ☐ **DUAL AGENCY**

23c. ☐ **SELLER'S AGENT**

23d. ☑ **BUYER'S AGENT**

23.1) **BUYER'S AGENT:** Marcus & Millichap Real Estate Investment Services is the broker representing the Buyer (and the Buyer only) in this transaction.   __***__   is the broker representing the Seller (and the Seller only).

24) **OTHER BROKERS:** Buyer and Seller agree that, in the event any broker other than Agent or a broker affiliated with Agent is involved in the disposition of the Property, Agent shall have no liability to Buyer or Seller for the acts or omissions of such other broker, who shall not be deemed to be a subagent of Agent.

25) **LIMITATION OF LIABILITY:** Except for Agent's gross negligence or willful misconduct, Agent's liability for any breach or negligence in its performance of this Agreement shall be limited to the greater of $50,000 or the amount of compensation actually received by Agent in any transaction hereunder.

26) **SCOPE OF AGENT'S AUTHORITY AND RESPONSIBILITY:** Agent shall have no authority to bind either Buyer or Seller to any modification or amendment of this Agreement. Agent shall not be responsible for performing any due diligence or other investigation of the Property on behalf of either Buyer or Seller, or for providing either party with professional advice with respect to any legal, tax, engineering, construction or hazardous materials issues. Except for maintaining the confidentiality of any information regarding Buyer or Seller's financial condition and any future negotiations regarding the terms of this Purchase Agreement or as otherwise required by law, Buyer and Seller agree that their relationship with Agent is at arm's length and is neither confidential nor fiduciary in nature.

27) **BROKER DISCLAIMER:** Buyer and Seller acknowledge that, except as otherwise expressly stated herein, Agent has not made any investigation, determination, warranty or representation with respect to any of the following: (a) the financial condition or business prospects of any tenant, or such tenant's intent to continue or renew its tenancy in the Property; (b) the legality of the present or any possible future use of the Property under any federal, state or local law; (c) pending or possible future action by any governmental entity or agency which may affect the Property; (d) the physical condition of the Property, including but not limited to, soil conditions, the structural integrity of the improvements, and the presence or absence of fungi, mold or wood-destroying organisms; (e) the accuracy or completeness of income and expense information and projections, of square footage figures, and of the texts of leases, options, and other agreements affecting the Property; (f) the possibility that lease, options or other documents exist which affect or encumber the Property and which have not been provided or disclosed by Seller; or (g) the presence or location of any hazardous materials on or about the Property, including, but not limited to, asbestos, PCB's, or toxic, hazardous or contaminated substances, lead-based paint and underground storage tanks.

Buyer agrees that investigation and analysis of the foregoing matters is Buyer's sole responsibility and that Buyer shall not hold Agent responsible therefore. Buyer further agrees to reaffirm its acknowledgment of this disclaimer at close of escrow and to confirm that it has relied upon no representations of Agent in connection with its acquisition of the Property.

BUYER'S INITIALS _*(initialed)*_   SELLER'S INITIALS _*(initialed)*_

0618

28) **LEAD-BASED PAINT HAZARDS**: Every purchaser of any interest in residential real property on which a residential dwelling was built prior to 1978 is notified that such property may present exposure to lead from lead-based paint that may place young children at risk of developing lead poisoning. Lead poisoning in young children may produce permanent neurological damage, including learning disabilities, reduced intelligence quotient, behavioral problems, and impaired memory. Lead poisoning also poses a particular risk to pregnant women. The seller of any interest in residential real property is required to provide the buyer with any information on lead-based paint hazards. A risk assessment or inspection for possible lead-based paint hazards is recommended prior to purchase. **(SELLER TO INITIAL ONE BELOW)**:

⌐ 1. Seller warrants that the Property was constructed after 1978.     **SELLER'S INITIALS** ╱. ⌣

⌐ 2. Seller is not sure when the Property was constructed and/or has reason to believe that lead-based paint hazards may be present.     **SELLER'S INITIALS** ╱. ⌣

0619

29) **MOLD/ALLERGEN ADVISORY AND DISCLOSURE:** Buyer is advised of the possible presence within properties of toxic (or otherwise illness-causing) molds, fungi, spores, pollens and/or other botanical substances and/or allergens (e.g. dust, pet dander, insect material, etc.). These substances may be either visible or invisible, may adhere to walls and other accessible and inaccessible surfaces, may be embedded in carpets or other fabrics, may become airborne, and may be mistaken for other household substances and conditions. Exposure carries the potential of possible health consequences. Agent strongly recommends that Buyer contact the State Department of Health Services for further information on this topic.

Buyer is advised to consider engaging the services of an environmental or industrial hygienist (or similar, qualified professional) to inspect and test for the presence of harmful mold, fungi, and botanical allergens and substances as part of Buyer's physical condition inspection of the Property, and Buyer is further advised to obtain from such qualified professionals information regarding the level of health-related risk involved, if any, and the advisability and feasibility of eradication and abatement, if any.

Buyer is expressly cautioned that Agent has no expertise in this area and is, therefore, incapable of conducting any level of inspection of the Property for the possible presence of mold and botanical allergens. Buyer acknowledges that Agent has not made any investigation, determination, warranty or representation with respect to the possible presence of mold or other botanical allergens, and Buyer agrees that the investigation and analysis of the foregoing matters is Buyer's sole responsibility and that Buyer shall not hold Agent responsible therefore.

30) **WATER HEATER DISCLOSURE:** Seller certifies that it has complied with the water heater earthquake protection requirements set forth in California Health and Safety Code section 19211.

Buyer is advised that Agent has no expertise in this area and is, therefore, incapable of conducting any level of inspection of the Property for the possible non-standard and/or unsafe water heater bracing, anchoring, or strapping to resist movement due to earthquakes. Buyer understands that Agent has not made any investigation, determination, warranty or representation with respect to the possible unfit water heater bracing, anchoring, or strapping or other standards, and Buyer agrees that the investigation and analysis of the foregoing matters is Buyer's sole responsibility and that Buyer shall not hold Agent responsible therefore.

31) **MANDATORY TITLE 24 LIGHTING REQUIREMENTS:** California's new Building Energy Efficiency Standards (Title 24, part 6), which took effect on July 1, 2014, established higher standards for improving energy efficiency in both residential and non-residential California real estate. Buyer acknowledges and agrees that it is aware of and familiar with the standards, as well as the potential cost of retrofitting and compliance, and has considered and incorporated such cost in its decision to enter into this Agreement. For more information, see http://www.energy.ca.gov/title24/2013standards/

0620

32) **ARBITRATION OF DISPUTES AND WAIVER OF JURY TRIAL:** All disputes arising between the Parties with respect to the subject matter of this Purchase Agreement or the transaction contemplated herein (including but not limited to the parties' rights to the Deposit or the payment of commissions as provided herein) shall be settled exclusively by final, binding arbitration. The judgment upon the award rendered by the arbitrator may be entered in any court having jurisdiction.

The arbitration will proceed in the county where Agent's office is located and be conducted by ADR Services, Inc. ("ADR"), or such other administrator as the parties shall mutually agree upon, in accordance with ADR's arbitration rules (the "Rules"). Any party who fails or refuses to submit to arbitration following a demand by the other party shall bear all costs and expenses, including attorneys' fees, incurred by such other party in compelling arbitration.

The arbitration will be decided by a single arbitrator selected according to the Rules. The arbitrator will decide any pre-hearing motions which are similar to motions to dismiss for failure to state a claim or motions for summary adjudication and may grant any remedy or relief that a court could order or grant on similar motions. The arbitrator shall apply the provisions of this Representation Agreement without varying therefrom, and shall not have the power to add to, modify, or change any of the provisions hereof.

In any arbitration proceeding discovery will be permitted only in accordance with the terms of this paragraph. Discovery by each party shall be limited to: (i) a maximum number of five (5) depositions limited to four hours each; (ii) requests for production of documents; (iii) two interrogatories: one inquiring into the amount of damages sought by the other party and another into the calculation of those damages; and (iv) subpoenas upon third parties for production of documents, depositions, and to appear at a hearing. The scope of discovery may be expanded only upon the mutual consent of the parties. Discovery not set forth in this paragraph shall not be permitted.

**NOTICE: BY INITIALING IN THE SPACE BELOW YOU ARE AGREEING TO HAVE ANY DISPUTE ARISING OUT OF THE MATTERS INCLUDED IN THE "ARBITRATION OF DISPUTES" PROVISION DECIDED BY NEUTRAL ARBITRATION AS PROVIDED BY CALIFORNIA LAW AND YOU ARE GIVING UP ANY RIGHTS YOU MIGHT POSSESS TO HAVE THE DISPUTE LITIGATED IN COURT OR JURY TRIAL. BY INITIALING IN THE SPACE BELOW YOU ARE GIVING UP YOUR JUDICIAL RIGHTS TO DISCOVERY AND APPEAL, UNLESS SUCH RIGHTS ARE SPECIFICALLY INCLUDED IN THE "ARBITRATION OF DISPUTES" PROVISION. IF YOU REFUSE TO SUBMIT TO ARBITRATION AFTER AGREEING TO THIS PROVISION, YOU MAY BE COMPELLED TO ARBITRATE UNDER THE AUTHORITY OF THE CALIFORNIA CODE OF CIVIL PROCEDURE. YOUR AGREEMENT TO THIS ARBITRATION PROVISION IS VOLUNTARY.**

**WE HAVE READ AND UNDERSTAND THE FOREGOING AND AGREE TO SUBMIT DISPUTES ARISING OUT OF THE MATTERS INCLUDED IN THE "ARBITRATION OF DISPUTES" PROVISION TO NEUTRAL ARBITRATION.**

BUYER'S INITIALS _~lrrf~_   SELLER'S INITIALS _J._

BUYER'S AGENT INITIALS _~lrrf~_   SELLER'S AGENT INITIALS _J.C_

33) **SUCCESSORS & ASSIGNS:** This Agreement and any addenda hereto shall be binding upon and inure to the benefit of the heirs, successors, agents, representatives and assigns of the parties hereto.

34) **TIME:** Time is of the essence of this Agreement.

35) **NOTICES:** All notices required or permitted hereunder shall be given to the parties in writing (with a copy to Agent) at their respective addresses as set forth below. Should the date upon which any act required to be performed by this Agreement fall on a Saturday, Sunday or holiday, the time for performance shall be extended to the next business day.

36) **FOREIGN INVESTOR DISCLOSURE:** Seller and Buyer agree to execute and deliver any instrument, affidavit or statement, and to perform any act reasonably necessary to carry out the provisions of this Foreign Investment in Real Property Tax Act and regulations promulgated thereunder. Seller represents that Seller is not a foreign person as defined in Section 1445 of the Internal Revenue Code and withholding of any portion of the purchase price is not required under Sections 18662 or 18668 of the California Revenue and Taxation Code.

37) **ADDENDA:** Any addendum attached hereto and either signed or initialed by the parties shall be deemed a part hereof. This Agreement, including addenda, if any, expresses the entire agreement of the parties and supersedes any and all previous agreements between the parties with regard to the Property. There are no other understandings, oral or written, which in any way alter or enlarge its terms, and there are no warranties or representations of any nature whatsoever, either express or implied, except as set forth herein. Any future modification of this Agreement will be effective only if it is in writing and signed by the party to be charged.

0621

BUYER'S INITIALS _~lrrf~_   SELLER'S INITIALS _J.C_

CA - Copyright Marcus & Millichap 2016

38) **ACCEPTANCE AND EFFECTIVE DATE:** Buyer's signature hereon constitutes an offer to Seller to purchase the Property on the terms and conditions set forth herein. Unless acceptance hereof is made by Seller's execution of this Agreement and delivery of a fully executed copy to Buyer, either in person or at the address shown below, or by facsimile or e-mail with a legitimate confirmation of receipt, on or before **January 18** ᵗʰ, 20 **17** , this offer shall be null and void, the Deposit shall be returned to Buyer, and neither Seller nor Buyer shall have any further rights or obligations hereunder. Delivery shall be effective upon personal delivery to Buyer or Buyer's agent or, if by mail, on the next business day following the date of postmark. The "Effective Date" of this Agreement shall be the later of (a) the date on which Seller executes this Agreement, or (b) the date of or written acceptance (by either Buyer or Seller) of the final counter-offer submitted by the other party. Buyer and Seller both acknowledge and agree that a facsimile copy of this Agreement with a party's signature is as legally valid and binding as the original Agreement with an original signature. If Buyer is not an individual but a legal entity, Buyer's representative represents that he/she is authorized on behalf of the legal entity to sign this Agreement.

39) **OTHER BUYERS:** Buyer understands that Agent represents other buyers who may have an interest in similar, or the same property that Buyer is considering purchasing. Buyer understands, consents and agrees that Agent, at all times before, during and after his representation of Buyer, may also represent other prospective buyers in the purchase of any property offered for sale. Buyer understands, consents and agrees that, regardless of the particular agency relationship between Buyer and Agent, Agent's representation of other buyers does not constitute a breach of any duty to Buyer.

40) **GOVERNING LAW:** This Agreement shall be governed by and construed in accordance with the laws of the State of California.

41) **OTHER TERMS AND CONDITIONS:**

41.1) Franchise Contingency : Buyer shall have ~~Forty five~~ Sixty 60 mP J C (45) calendar days from the effective date to obtain approval from Red Roof Inns Inc for franchise license agreement. If buyer fails to obtain approval during the specified time, this agreement shall be null and void, buyer's entire deposit shall be returned, and buyer and seller shall have no further obligations hereunder. Buyer shall be responsible for all franchise application fees, licensing fees, and the cost of any property improvement plan as required by Red Roof Inns Inc.

40.2) Seller shall deliver all the rooms in rentable condition at close of escrow.

40.3) Buyer and Seller agree that this Purchase Agreement supersedes the agreement mP J C Executed by Buyer on October 17, 2016 and Nov 22, 2016, and by Seller on October 18, 2016. Item # 40.3 becomes effective only after this Purchase Agreement has been executed by both, buyer and seller. If either Party does not execute this Agreement, item 40.3 becomes NULL and VOID. mP

40.4) Buyer acknowledges that Buyer has agreed to pay Marcus and Millichap a commission of __ (as per separate agreement) % of the Purchase Price indicated in this agreement, or a flat fee of _____ dollars ($___) , in addition to the Purchase price indicated in this agreement.

40.4) Buyer shall pay to the seller an amount equal to the Account Receivables with maximum aging of sixty ( 60) days from the closing date at the close of escrow. up to maximum $ 15,000.00 (Fifteen thousand dollars). mP   J C

THE PARTIES UNDERSTAND AND ACKNOWLEDGE THAT BROKER IS NOT QUALIFIED TO PROVIDE, AND HAS NOT BEEN CONTRACTED TO PROVIDE, LEGAL, FINANCIAL OR TAX ADVICE, AND THAT ANY SUCH ADVICE MUST BE OBTAINED FROM THE RESPECTIVE PARTY'S ATTORNEY, ACCOUNTANT OR TAX PROFESSIONAL. THE PARTIES AGREE THAT THIS AGREEMENT CAN BE SIGNED IN COUNTERPART WITH THE SAME LEGAL FORCE AND EFFECT AS IF NOT SIGNED IN COUNTERPART.

The undersigned Buyer hereby offers and agrees to purchase the above-described Property for the price and upon the terms and conditions herein stated.

☑ **BUYER REGISTRATION**

In the event Buyer and Seller should not reach an agreement as stated herein, Buyer will be responsible to Marcus & Millichap for a commission in the amount of six percent (6%) of purchase price stated herein should Buyer broker, buy, lease or come into possession of any of the properties referenced in this Agreement within twelve (12) months of the date of this Agreement. Should Buyer become the manager or connected with any of the businesses listed or should Buyer go into business independently at any of the locations listed herein, within said time, then said acts shall be equivalent to and constitute a purchase for the purpose of this Agreement. To all of the foregoing Buyer agrees regardless of whether Marcus & Millichap has an active listing. Buyer agrees that Buyer has had no previous information concerning the places on this list.

CA Purch DS 040416 (3).docm        10 of 14   BUYER'S INITIALS _mP_   SELLER'S INITIALS _J C_
                                                                    CA - Copyright Marcus & Millichap 2016

0622

38) **ACCEPTANCE AND EFFECTIVE DATE:** Buyer's signature hereon constitutes an offer to Seller to purchase the Property on the terms and conditions set forth herein. Unless acceptance hereof is made by Seller's execution of this Agreement and delivery of a fully executed copy to Buyer, either in person or at the address shown below, or by facsimile or e-mail with a legitimate confirmation of receipt, on or before **October 20**, 20 **16**, this offer shall be null and void, the Deposit shall be returned to Buyer, and neither Seller nor Buyer shall have any further rights or obligations hereunder. Delivery shall be effective upon personal delivery to Buyer or Buyer's agent or, if by mail, on the next business day following the date of postmark. The "Effective Date" of this Agreement shall be the later of (a) the date on which Seller executes this Agreement, or (b) the date of or written acceptance (by either Buyer or Seller) of the final counter-offer submitted by the other party. Buyer and Seller both acknowledge and agree that a facsimile copy of this Agreement with a party's signature is as legally valid and binding as the original Agreement with an original signature. If Buyer is not an individual but a legal entity, Buyer's representative represents that he/she is authorized on behalf of the legal entity to sign this Agreement.

39) **OTHER BUYERS:** Buyer understands that Agent represents other buyers who may have an interest in similar, or the same property that Buyer is considering purchasing. Buyer understands, consents and agrees that Agent, at all times before, during and after his representation of Buyer, may also represent other prospective buyers in the purchase of any property offered for sale. Buyer understands, consents and agrees that, regardless of the particular agency relationship between Buyer and Agent, Agent's representation of other buyers does not constitute a breach of any duty to Buyer.

40) **GOVERNING LAW:** This Agreement shall be governed by and construed in accordance with the laws of the State of California.

41) **OTHER TERMS AND CONDITIONS:**

   **41.1) Franchise Contingency : Buyer shall have forty five (45) calendar days from the effective date to obtain approval from Red Roof Inns Inc for franchise license agreement. If buyer fails to obtain approval during the specified time, this agreement shall be null and void, buyer's entire deposit shall be returned, and buyer and seller shall have no further obligations hereunder. Buyer shall be responsible for all franchise application fees, licensing fees, and the cost of any property improvement plan as required by Red Roof Inns Inc.**

   **40.2) Seller shall deliver all the rooms in rentable condition at close of escrow.**

THE PARTIES UNDERSTAND AND ACKNOWLEDGE THAT BROKER IS NOT QUALIFIED TO PROVIDE, AND HAS NOT BEEN CONTRACTED TO PROVIDE, LEGAL, FINANCIAL OR TAX ADVICE, AND THAT ANY SUCH ADVICE MUST BE OBTAINED FROM THE RESPECTIVE PARTY'S ATTORNEY, ACCOUNTANT OR TAX PROFESSIONAL. THE PARTIES AGREE THAT THIS AGREEMENT CAN BE SIGNED IN COUNTERPART WITH THE SAME LEGAL FORCE AND EFFECT AS IF NOT SIGNED IN COUNTERPART.

The undersigned Buyer hereby offers and agrees to purchase the above-described Property for the price and upon the terms and conditions herein stated.

☑ **BUYER REGISTRATION**

In the event Buyer and Seller should not reach an agreement as stated herein, Buyer will be responsible to Marcus & Millichap for a commission in the amount of six percent (6%) of purchase price stated herein should Buyer broker, buy, lease or come into possession of any of the properties referenced in this Agreement within twelve (12) months of the date of this Agreement. Should Buyer become the manager or connected with any of the businesses listed or should Buyer go into business independently at any of the locations listed herein, within said time, then said acts shall be equivalent to and constitute a purchase for the purpose of this Agreement. To all of the foregoing Buyer agrees regardless of whether Marcus & Millichap has an active listing. Buyer agrees that Buyer has had no previous information concerning the places on this list.

This offer is made by Buyer to Seller on this **Thirteenth** day of **October**, 20 **16**. The undersigned Buyer hereby acknowledges receipt of an executed copy of this Agreement, including the Agency Disclosure contained in Paragraph 23, above.

All individuals signing below on behalf of a legal entity hereby represent that they are authorized by, and on behalf of, said entity to enter into this Agreement.

0623

16 th  mp

This offer is made by Buyer to Seller on this ~~4th~~ day of __January__ , 20 __17__ .  The undersigned Buyer hereby acknowledges receipt of an executed copy of this Agreement, including the Agency Disclosure contained in Paragraph 23, above.

All individuals signing below on behalf of a legal entity hereby represent that they are authorized by, and on behalf of, said entity to enter into this Agreement.

BUYER'S SIGNATURE (PRIMARY):

_Mukesh (Mike ) Patel and/or assignee_

ADDRESS:

DATE:  1/16/2017

TELEPHONE:

BUYER'S SIGNATURE (SECONDARY):

ADDRESS:

DATE:

TELEPHONE:

### SELLER'S ACCEPTANCE AND BUYER'S AGREEMENT TO PAY COMMISSION

The undersigned Seller accepts the foregoing offer and agrees to sell the Property to Buyer for the price and on the terms and conditions stated herein.  Seller acknowledges receipt of an executed copy of this Agreement and authorizes Agent to deliver an executed copy to Buyer.

☐   EXCLUSIVE LISTING
☑   NON-EXCLUSIVE LISTING

In the event Marcus & Millichap procured a Buyer through an Open Listing of Seller and does not have a Representation Agreement with the Seller, ~~Seller~~ Buyer hereby agrees to pay Marcus & Millichap a commission of **(as per separate agreement)** percent (     %) of the Purchase Price indicated in this Agreement or the flat rate of _____ dollars ($     ) In addition to the Purchase Price indicated in this agreement in consideration of Marcus & Millichap's services.  ~~Seller~~ Buyer agrees to pay Marcus & Millichap a commission if the Buyer listed in this Agreement, regardless of whether this particular Agreement is completed, if Buyer comes into ownership and/or possession within twelve (12) months of the date of this Agreement.

Where ~~Seller~~ Buyer has agreed to pay a commission, ~~Seller~~ Buyer acknowledges and agrees that payment of said commission is not contingent upon the closing of the transaction contemplated by this Agreement, and that, in the event completion of the sale is prevented by default of ~~Seller~~ Buyer, then ~~Seller~~ Buyer shall immediately be obligated to pay to Agent the entire commission.  ~~Seller~~ Buyer agrees that in the event completion of the sale is prevented by default of Buyer, then Seller shall be obligated to pay to Agent an amount equal to one half of any damages or other monetary compensation (including liquidated damages) collected from Buyer by suit or otherwise as a consequence of Buyer's default, if and when such damages or other monetary compensation are collected; provided, however, that the total amount paid to Agent by Seller shall not in any case exceed the brokerage commission hereinabove set forth.  Seller acknowledges and agrees that the existence of any direct claim which Agent may have against Buyer in the event of Buyer's default shall not alter or in any way limit the obligations of Seller to Agent as set forth herein.  The provisions of this paragraph may not be amended or modified without the written consent of Agent.

☐   SUBJECT TO ATTACHED COUNTER-OFFER

SELLER'S SIGNATURE (PRIMARY):

James Choi
Pinnacle    Hospitality
Inc

ADDRESS:

DATE:

TELEPHONE:

CA Purch DS 040416 (3).docm          11  of 14    **BUYER'S INITIALS** _____   **SELLER'S INITIALS** _____
CA - Copyright Marcus & Millichap 2016

0624

BUYER'S SIGNATURE (PRIMARY): _____  ADDRESS: _____

Mukesh (Mike ) Patel and/or assignee

DATE: _____10/17/2016_____   TELEPHONE: _____

BUYER'S SIGNATURE (SECONDARY): _____  ADDRESS: _____

DATE: _____   TELEPHONE: _____

## SELLER'S ACCEPTANCE AND AGREEMENT TO PAY COMMISSION

The undersigned Seller accepts the foregoing offer and agrees to sell the Property to Buyer for the price and on the terms and conditions stated herein. Seller acknowledges receipt of an executed copy of this Agreement and authorizes Agent to deliver an executed copy to Buyer.

☐  EXCLUSIVE LISTING
☑  NON-EXCLUSIVE LISTING

In the event Marcus & Millichap procured a Buyer through an Open Listing of Seller and does not have a Representation Agreement with the Seller, Seller hereby agrees to pay Marcus & Millichap a commission of **as per separate agreement on file** percent ( %) of the Purchase Price indicated in this Agreement or the flat rate of _____ dollars ($ _____ ) in consideration of Marcus & Millichap's procurement of a ready, willing and able buyer. Seller agrees to pay Marcus & Millichap a commission if the Buyer listed in this Agreement, regardless of whether this particular Agreement is completed, if Buyer comes into ownership and/or possession within twelve (12) months of the date of this Agreement.

Where Seller has agreed to pay a commission, Seller acknowledges and agrees that payment of said commission is not contingent upon the closing of the transaction contemplated by this Agreement, and that, in the event completion of the sale is prevented by default of Seller, then Seller shall immediately be obligated to pay to Agent the entire commission. Seller agrees that in the event completion of the sale is prevented by default of Buyer, then Seller shall be obligated to pay to Agent an amount equal to one half of any damages or other monetary compensation (including liquidated damages) collected from Buyer by suit or otherwise as a consequence of Buyer's default, if and when such damages or other monetary compensation are collected; provided, however, that the total amount paid to Agent by Seller shall not in any case exceed the brokerage commission hereinabove set forth. Seller acknowledges and agrees that the existence of any direct claim which Agent may have against Buyer in the event of Buyer's default shall not alter or in any way limit the obligations of Seller to Agent as set forth herein. The provisions of this paragraph may not be amended or modified without the written consent of Agent.

☐  SUBJECT TO ATTACHED COUNTER-OFFER

SELLER'S SIGNATURE (PRIMARY): _____  ADDRESS: Pinnacle Hospitality Inc.

James Choi
Seoul Plaza Inc

DATE: _____10/18/16_____   TELEPHONE: _____

SELLER'S SIGNATURE (SECONDARY): _____  ADDRESS: _____

DATE: _____   TELEPHONE: _____

Agent accepts and agrees to the foregoing. Agent represents and warrants that Agent is unaware of any incorrect or incomplete information contained in any Natural Hazard Disclosures.

0625

CA Purch DS 040416 (3).docx        11 of 14        BUYER'S INITIALS _____   SELLER'S INITIALS _____

CA - Copyright Marcus & Millichap 2016

SELLER'S SIGNATURE
(SECONDARY): _____     ADDRESS: _____
                                               _____

DATE: _____              TELEPHONE: _____

Agent accepts and agrees to the foregoing. Agent represents and warrants that Agent is unaware of any incorrect or incomplete Information contained in any Natural Hazard Disclosures.

AGENT: **MARCUS & MILLICHAP REAL ESTATE INVESTMENT SERVICES, INC.**

AGENT'S SIGNATURE: _____     ADDRESS: **3281 E Guasti Rd Ste, 800**
                       **Aseem Tandon**              **Ontario, CA 91761**
AGENT LICENSE NO. **CA : 01725152**

DATE: _____              TELEPHONE: **909-456-7016**

Escrow Holder acknowledges receipt of a copy of this Agreement (if checked _____ a deposit amount of _____ dollars ($ _____ )), Counter Offer numbers _____ and _____ and agrees to act as Escrow Holder subject to Paragraph 3 of this Agreement, any supplemental escrow instructions and the terms of Escrow Holder's general provisions.

The date of communication of Acceptance of the Agreement between Buyer and Seller is _____, 20_____.

ESCROW
HOLDER: _____            ESCROW #: _____

BY: _____                DATE: _____

ADDRESS: _____           EMAIL: _____
PHONE: _____             FAX: _____
ESCROW
HOLDER IS
LICENSED BY: _____        LICENSE #: _____

PARTIES UNDERSTAND AND ACKNOWLEDGE THAT BROKER IS NOT QUALIFIED TO PROVIDE, AND HAS NOT BEEN CONTRACTED TO PROVIDE, LEGAL, FINANCIAL OR TAX ADVICE, AND THAT ANY SUCH ADVICE MUST BE OBTAINED FROM PARTIES' ATTORNEY, ACCOUNTANT OR TAX PROFESSIONAL

0626

AGENT: **MARCUS & MILLICHAP REAL ESTATE INVESTMENT SERVICES, INC.**

AGENT'S SIGNATURE: _____

ADDRESS: <u>3281 E Guasti Rd Ste, 800</u>
<u>Ontario, CA 91761</u>

AGENT LICENSE NO. <u>CA : 01725152</u>

DATE: _____

TELEPHONE: <u>909-456-7016</u>

Escrow Holder acknowledges receipt of a copy of this Agreement (if checked _____ a deposit amount of _____ dollars ($ _____ )), Counter Offer numbers _____ and _____ and agrees to act as Escrow Holder subject to Paragraph 3 of this Agreement, any supplemental escrow instructions and the terms of Escrow Holder's general provisions.

The date of communication of Acceptance of the Agreement between Buyer and Seller is _____, 20_____.

ESCROW
HOLDER: _____

ESCROW #: _____

BY: _____

DATE: _____

ADDRESS: _____
PHONE: _____

EMAIL: _____
FAX: _____

ESCROW
HOLDER IS
LICENSED BY: _____

LICENSE #:: _____

PARTIES UNDERSTAND AND ACKNOWLEDGE THAT BROKER IS NOT QUALIFIED TO PROVIDE, AND HAS NOT BEEN CONTRACTED TO PROVIDE, LEGAL, FINANCIAL OR TAX ADVICE, AND THAT ANY SUCH ADVICE MUST BE OBTAINED FROM PARTIES' ATTORNEY, ACCOUNTANT OR TAX PROFESSIONAL

0627

JL

## DISCLOSURE REGARDING REAL ESTATE AGENCY RELATIONSHIPS
(As required by the Civil Code)

When you enter into a discussion with a real estate agent regarding a real estate transaction, you should from the outset understand what type of agency relationship or representation you wish to have with the agent in the transaction.

### SELLER'S AGENT

A Seller's agent under a listing agreement with the Seller acts as the agent for the Seller only. A Seller's agent or a subagent of that agent has the following affirmative obligations:

To the Seller:
A fiduciary duty of utmost care, integrity, honesty, and loyalty in dealings with the Seller.

To the Buyer and the Seller:
(a) Diligent exercise of reasonable skill and care in performance of the agent's duties.
(b) A duty of honest and fair dealing and good faith.
(c) A duty to disclose all facts known to the agent materially affecting the value or desirability of the property that are not known to, or within the diligent attention and observation of, the parties. An agent is not obligated to reveal to either party any confidential information obtained from the other party that does not involve the affirmative duties set forth above.

### BUYER'S AGENT

A selling agent can, with a Buyer's consent, agree to act as agent for the Buyer only. In these situations, the agent is not the Seller's agent, even if by agreement the agent may receive compensation for services rendered, either in full or in part from the Seller. An agent acting only for a Buyer has the following affirmative obligations:

To the Buyer:
A fiduciary duty of utmost care, integrity, honesty, and loyalty in dealings with the Buyer.
To the Buyer and the Seller:
(a) Diligent exercise of reasonable skill and care in performance of the agent's duties.
(b) A duty of honest and fair dealing and good faith.
(c) A duty to disclose all facts known to the agent materially affecting the value or desirability of the property that are not known to, or within the diligent attention and observation of, the parties. An agent is not obligated to reveal to either party any confidential information obtained from the other party that does not involve the affirmative duties set forth above.

### AGENT REPRESENTING BOTH SELLER AND BUYER

A real estate agent, either acting directly or through one or more associate licensees, can legally be the agent of both the Seller and the Buyer in a transaction, but only with the knowledge and consent of both the Seller and the Buyer. In a dual agency situation, the agent has the following affirmative obligations to both the Seller and the Buyer:
(a) A fiduciary duty of utmost care, integrity, honesty and loyalty in the dealings with either the Seller or the Buyer.
(b) Other duties to the Seller and the Buyer as stated above in their respective sections. In representing both Seller and Buyer, the agent may not, without the express permission of the respective party, disclose to the other party that the Seller will accept a price less than the listing price or that the Buyer will pay a price greater than the price offered.
The above duties of the agent in a real estate transaction do not relieve a Seller or Buyer from the responsibility to protect his or her own interests. You should carefully read all agreements to assure that they adequately express your understanding of the transaction. A real estate agent is a person qualified to advise about real estate. If legal or tax advice is desired, consult a competent professional. Throughout your real property transaction you may receive more than one disclosure form, depending upon the number of agents assisting in the transaction. The law requires each agent with whom you have more than a casual relationship to present you with this disclosure form. You should read its contents each time it is presented to you, considering the relationship between you and the real estate agent in your specific transaction.
This disclosure form includes the provisions of Sections 2079.13 to 2079.24, inclusive, of the Civil Code set forth on the reverse hereof. Read it carefully.

SIGNED:

| | | |
|---|---|---|
| _____ | _____ | |
| AGENT'S SIGNATURE (date) | BUYER/SELLER (PRIMARY) (date) | |
| _____ | _____ | 0628 |
| ASSOCIATE LICENSEE/BROKER (date) | BUYER/SELLER (SECONDARY) (date) | |

CA Purch DS 040416 (3).docm        13 of 14   BUYER'S INITIALS _____ SELLER'S INITIALS _____

CA - Copyright Marcus & Millichap 2016

**Civil Code Sections 2079.13 through 2079.24**

**Section 2079.13.** As used in Sections 2079.14 to 2079.24, inclusive, the following terms have the following meanings: (a) "Agent" means a person acting under provisions of Title 9 (commencing with Section 2295) in a real property transaction, and includes a person who is licensed as a real estate broker under Chapter 3 (commencing with Section 10130) of Part 1 of Division 4 of the Business and Professions Code, and under whose license a listing is executed or an offer to purchase is obtained. (b) "Associate licensee" means a person who is licensed as a real estate broker or salesperson under Chapter 3 (commencing with Section 10130) of Part 1 of Division 4 of the Business and Professions Code and who is either licensed under a broker or has entered into a written contract with a broker to act as the broker's agent in connection with acts requiring a real estate license and to function under the broker's supervision in the capacity of an associate licensee. The agent in the real property transaction bears responsibility for his or her associate licensees who perform as agents of the agent. When an associate licensee owes a duty to any principal, or to any buyer or seller who is not a principal, in a real property transaction, that duty is equivalent to the duty owed to that party by the broker for whom the associate licensee functions. (c) "Buyer" means a transferee in a real property transaction, and includes a person who executes an offer to purchase real property from a seller through an agent, or who seeks the services of an agent in more than a casual, transitory, or preliminary manner, with the object of entering into a real property transaction. "Buyer" includes vendee or lessee. (d) "Dual agent" means an agent acting, either directly or through an associate licensee, as agent for both the seller and the buyer in a real property transaction. (e) "Listing agreement" means a contract between an owner of real property and an agent, by which the agent has been authorized to sell the real property or to find or obtain a buyer. (f) "Listing price" means a person who has obtained a listing of real property to act as an agent for compensation. (g) "Listing price" is the amount expressed in dollars specified in the listing for which the seller is willing to sell the real property through the listing agent. (h) "Offering price" is the amount expressed in dollars specified in an offer to purchase for which the buyer is willing to buy the real property. (i) "Offer to purchase" means a written contract executed by a buyer acting through a listing agent which becomes the contract for the sale of the real property upon acceptance by the seller. (j) "Real property" means any estate specified by subdivision (1) or (2) of Section 761 in property which constitutes or is improved with one to four dwelling units, any leasehold in this type of property exceeding one year's duration, and mobile homes, when offered for sale or sold through an agent pursuant to the authority contained in Section 10131.6 of the Business and Professions Code. (k) "Real property transaction" means a transaction for the sale of real property in which an agent is employed by one or more of the principals to act in that transaction, and includes a listing or an offer to purchase. (l) "Sell," "sale," or "sold" refers to a transaction for the transfer of real property from the seller to the buyer, and includes exchanges of real property between the seller and buyer, transactions for the creation of a real property sales contract within the meaning of Section 2985, and transactions for the creation of a leasehold exceeding one year's duration. (m) "Seller" means the transferor in a real property transaction, and includes an owner who lists real property with an agent, whether or not a transfer results, or who receives an offer to purchase real property of which he or she is the owner from an agent on behalf of another. "Seller" includes both a vendor and a lessor. (n) "Selling agent" means a listing agent who acts alone, or an agent who acts in cooperation with a listing agent, and who sells or finds and obtains a buyer for the real property, or an agent who locates property for a buyer or who finds a buyer for a property for which no listing exists and presents an offer to purchase to the seller. (o) "Subagent" means a person to whom an agent delegates agency powers as provided in Article 5 (commencing with Section 2349) of Chapter 1 of Title 9. However, "subagent" does not include an associate licensee who is acting under the supervision of an agent in a real property transaction.

**Section 2079.14.** Listing agents and selling agents shall provide the seller and buyer in a real property transaction with a copy of the disclosure form specified in Section 2079.16, and, except as provided in subdivision (c), shall obtain a signed acknowledgment of receipt from that seller or buyer, except as provided in this section or Section 2079.15, as follows: (a) The listing agent, if any, shall provide the disclosure form to the seller prior to entering into the listing agreement. (b) The selling agent shall provide the disclosure form to the seller as soon as practicable prior to presenting the seller with an offer to purchase, unless the selling agent previously provided the seller with a copy of the disclosure form pursuant to subdivision (a). (c) Where the selling agent does not deal on a face-to-face basis with the seller, the disclosure form prepared by the selling agent may be furnished to the seller and acknowledgment of receipt obtained for the selling agent from the seller) by the listing agent, or the selling agent may deliver the disclosure form by certified mail addressed to the seller at his or her last known address, in which case no signed acknowledgment of receipt is required. (d) The selling agent shall provide the disclosure form to the buyer as soon as practicable prior to execution of the buyer's offer to purchase, except that if the offer to purchase is not prepared by the selling agent, the selling agent shall present the disclosure form to the buyer not later than the next business day after the selling agent receives the offer to purchase from the buyer.

**Section 2079.15.** In any circumstance in which the seller or buyer refuses to sign an acknowledgment of receipt pursuant to Section 2079.14, the agent, or an associate licensee acting for an agent, shall set forth, sign, and date a written declaration of the facts of the refusal.

**Section 2079.16.** This disclosure appears on Page 1.

**Section 2079.17.** (a) As soon as practicable, the selling agent shall disclose to the buyer and seller whether the selling agent is acting in the real property transaction exclusively as the buyer's agent, exclusively as the seller's agent, or as a dual agent representing both the buyer and the seller. This relationship shall be confirmed in the contract to purchase and sell real property or in a separate writing executed or acknowledged by the seller, the buyer, and the selling agent prior to or coincident with execution of that contract by the buyer and the seller, respectively. (b) As soon as practicable, the listing agent shall disclose to the seller whether the listing agent is acting in the real property transaction exclusively as the seller's agent, or as a dual agent representing both the buyer and seller. This relationship shall be confirmed in the contract to purchase and sell real property or in a separate writing executed or acknowledged by the seller and the listing agent prior to or coincident with the execution of that contract by the seller. (c) The confirmation required by subdivisions (a) and (b) shall be in the following form:

| | |
|---|---|
| _____ is the agent of (check one): | [ ] the seller exclusively; or [ ] both the buyer and seller. |
| (NAME OF LISTING AGENT) | |
| **ASEEM TANDON** is the agent of (check one): | [X] the buyer exclusively; or [ ] the seller exclusively; or |
| (NAME OF SELLING AGENT IF NOT THE SAME AS THE LISTING AGENT) | [ ] both the buyer and seller. |

(d) The disclosures and confirmation required by this section shall be in addition to the disclosure required by Section 2079.14.

**Section 2079.18.** No selling agent in a real property transaction may act as an agent for the buyer only, when the selling agent is also acting as the listing agent in the transaction.

**Section 2079.19.** The payment of compensation or the obligation to pay compensation to an agent by the seller or buyer is not necessarily determinative of a particular agency relationship between an agent and the seller or buyer. A listing agent and a selling agent may agree to share any compensation or commission paid, or any right to any compensation or commission for which an obligation arises as the result of a real estate transaction, and the terms of any such agreement shall not necessarily be determinative of a particular relationship.

**Section 2079.20.** Nothing in this article prevents an agent from selecting, as a condition of the agent's employment, a specific form of agency relationship not specifically prohibited by this article if the requirements of Section 2079.14 and Section 2079.17 are complied with.

**Section 2079.21.** A dual agent shall not disclose to the buyer that the seller is willing to sell the property at a price less than the listing price, without the express written consent of the seller. A dual agent shall not disclose to the seller that the buyer is willing to pay a price greater than the offering price, without the express written consent of the buyer. This section does not alter in any way the duty or responsibility of a dual agent to any principal with respect to confidential information other than price.

**Section 2079.22.** Nothing in this article precludes a listing agent from also being a selling agent, and the combination of these functions in one agent does not, of itself, make that agent a dual agent.

**Section 2079.23.** A contract between the principal and agent may be modified or altered to change the agency relationship at any time before the performance of the act which is the object of the agency with the written consent of the parties to the agency relationship.

**Section 2079.24.** Nothing in this article shall be construed to either diminish the duty of disclosure owed buyers and sellers by agents and their associate licensees, subagents, and employees or to relieve agents and their associate licensees, subagents, and employees from liability for their conduct in connection with acts governed by this article or for any breach of a fiduciary duty or a duty of disclosure.

0629

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**EXHIBIT "B"**



Since 1983

# Hanmi Escrow Co., Inc.

3130 West Olympic Blvd., Suite 400, Los Angeles, CA 90006
**TEL: (323) 735-4000  FAX: (323) 735-2400**

## ESCROW INSTRUCTIONS

Tom Cho
Escrow Officer

**ESCROW NO.:** 25616-TC
**DATE:** January 19, 2017

| | |
|---|---:|
| Buyer will hand you initial deposit in the amount of | 100,000.00 |
| Prior to close of escrow, buyer will deposit an additional amount of | 1,450,000.00 |
| Buyer herein to obtain a new first trust deed loan in the amount of | 4,650,000.00 |

### TOTAL CONSIDERATION                                    **$6,200,000.00**

I/We will deliver to you additional funds and any instruments which this escrow requires, all of which you are instructed to use provided that on or before **May 18, 2017** you hold a policy of title insurance with the usual title company's exceptions, with a liability of $6,200,000.00 covering property:

LEGAL DESCRIPTION ATTACHED HERETO AS EXHIBIT "A" AND MADE A PART HEREOF

**MEMO:** KNOWN AS: 72215 Varner Rd., Thousand Palms, CA 92276

**SHOWING TITLE VESTED IN:** Mukesh (Mike) Patel and/or Assignee (Exact title & vesting to be provided during escrow)

**FREE FROM ENCUMBRANCES EXCEPT:**
(1)   All General and Special Taxes for the fiscal year 2017-2018, including personal property taxes, if any, assessed against former owner.

(2)   Covenants, conditions, restrictions, reservations, rights, rights of way, and easements of record, if any.

(3)   First Deed of Trust to record securing a note in the amount of $4,650,000.00.

## INSTRUCTIONS:

1.   **In the event of cancellation, the parties shall pay you a sum sufficient to pay all costs and expenses you have incurred, including, but not limited to a cancellation fee for services rendered in an amount of $500.00 up to the full amount of the escrow fee. IN THE EVENT THAT THIS ESCROW IS POSTPONED CAUSED BY ACTS OR OMISSIONS OF THE PARTIES FOR AT LEAST 2 MONTHS FROM THE MOST RECENT CLOSING DATE AGREED UPON BY THE PARTIES, you as escrow holder may at your option, withdraw from any funds on deposit in escrow and pay to yourself a hold open administration fee of $50.00 for each calendar month or fraction thereof, that undistributed funds are retained in escrow. Further, in the event that escrow does not close for any reason including, without limitation, cancellation, following the original designated closing date, you as escrow holder may, at your option, withdraw the funds on deposit in escrow and pay to yourself a holding fee of $50.00 for each calendar month or fraction thereof, the undistributed funds are retained in escrow. In paying cancellation fees or hold open fees in this escrow you are released of liability and responsibility and indemnified and held harmless in doing so. IN THE EVENT ANY PARTY REQUESTS CANCELLATION OF THIS ESCROW AT ANY TIME ALL SUCH PARTIES ARE AWARE THAT THIS ESCROW WILL NOT BE CONSIDERED CANCELLED AND NO FUNDS WILL BE DISBURSED TO THE PARTIES UNTIL ESCROW HOLDER HAS RECEIVED MUTUALLY SIGNED CANCELLATION INSTRUCTIONS IN FORM SATISFACTORY TO ESCROW FROM ALL SUCH PARTIES (BUYERS AND SELLERS AND AS MAY BE APPROPRIATE, BROKERS).**

Seller's Initials: J.C / S.C                    Buyer's Initials: _____ / _____     0604

2.   It is understood and agreed upon by the parties hereto that the documents entitled "Purchase Agreement" dated January 16, 2017 (hereinafter "Agreement") which are attached hereto, are incorporated herein by reference and made a part hereof as though fully set forth herein, except to the extent modified by the provisions of the escrow

Page 2 of 5:  Additional instructions made a part of previous pages as fully incorporated therein.

b.  The account shall be a money market account with a deposit in the sum of $100,000.00.

c.  The account shall be opened as soon as possible at Bank of Hope.

d.  The interest earned on the account shall be paid to the funds of the buyers, whether the escrow closes or is cancelled, as shall any accrued interest retained in the account after the transfer of the deposited funds and any interest thereon are redeposited to the escrow trust account.

e.  Escrow holder shall not withdraw any of the funds from the interest bearing account except for redeposit into the escrow trust account.

f.  The parties have been advised by the escrow holder of possible restrictions and/or penalties for early withdrawal of funds.

g.  In addition to escrow holder's other fees, escrow holder will be paid a fee in the amount of $75.00 for establishing the herein-provided interest bearing account.  This fee is to be paid by the depositor of the funds.

6.  This escrow is subject to the Buyer obtaining loan approval on a new first trust loan in the amount of $4,650,000.00 pursuant to paragraph 6.1 of the Agreement

7.  The purchase price includes certain business known as Red Roof Inn.

8.  **RELEASES:**
    a.    Seller shall furnish buyer through escrow not as a condition of this closing but prior to the final disbursement of funds, a tax release from the Employment Development Department

2.  **SELLER NOT OBLIGATED TO THE STATE BOARD OF EQUALIZATION:**  Seller does warrant the he is not obligated to the State Board of Equalization and "Certificate of Payment" from said agency is hereby waived.

3.  **SEARCHES:**  Obtain of the Secretary of State a UCC search under the name of seller, the business firm name, the corporation, if any, named herein as holding title to the business assets if other than the named seller, all only to the extent such names are provided you in writing herein, to show liens and encumbrances of record, if any. Further, obtain County search from the county in which subject business is located to show liens and encumbrances of record, if any.  UCC search charges shall be paid as follows:  50% by Seller and 50% by Buyer.

4.  Escrow holder is instructed NOT to record or publish Notice of Bulk Sale in connection with this sale.        Hanmi Escrow Co., Inc. is released of liabilities and responsibilities and is indemnified and held harmless in complying with these  instructions including attorneys' fees and costs that may be necessary to enforce this indemnity which shall survive the closing of escrow.

9.  **ASSEMBLY BILL 512: "GOOD FUNDS LAW".**  AB 512 enacts a new Section 12413.1 to the State of California Insurance Code that regulates real estate escrow disbursements by title insurance companies, controlled escrows and underwritten title companies.  The Bill requires that checks be deposited by the title company prior to escrow disbursement.

THE  NEW  LAW  ESTABLISHED  A  THREE-TIER  SYSTEM  TO  DETERMINE  WHEN  DISBURSEMENT  MAY OCCUR.
1) Cash and "Wired Funds" may be disbursed on the same day as deposited.
2) Tellers' checks, cashier's checks and certified checks may be disbursed on the first business day following the day of deposit.  (A teller's check is defined as a check drawn by an insured financial institution against another insured financial institution.)
3) Personal checks, corporate checks and drafts received from title companies (including escrow trust checks) may be disbursed on the day when the item must be made available for withdrawal by depositors under Regulation CC adopted by the Federal Reserve Board of Governors.  Until September 1, 1990, the hold period on these items is three (3) business days following the date of deposit of local checks and seven (7) business days following the date of deposit of non-local checks; after September 1, 1990, these hold periods will be reduced to two (2) business days following the date of deposit for local checks and five (5) business days following date of deposit for non-local checks.

2090

10.    **1099 FORM:** The undersigned Seller hereby acknowledge his or her awareness of the requirements of Internal Revenue Code Section 6045, and in connection therewith authorizes and instructs escrow holder, on Seller's

Date:  January 19, 2017                                                    Escrow No.:  25616-TC

Page 3 of 5:  Additional instructions made a part of previous pages as fully incorporated therein.

12.  **CAL-FIRPTA WITHHOLDING NOTIFICATION REQUIREMENT:** NOTIFICATION TO BUYER AND SELLER REGARDING TAX WITHHOLDING REQUIREMENTS OF CALIFORNIA REVENUE AND TAXATION CODE SECTION 18662 AS AMENDED BY AB2065 ON SALE OF REAL PROPERTY: As of January 1, 2003, California law requires "pay as you go" (prepayment) of income tax by withhold of 3-1/3% on all sales of real property for individuals sellers of real property, whether resident or non-resident. Individuals sellers may certify under penalty of perjury on Form 593-C that as individuals sellers they are not subject to withholding due to one of the exemptions: 1) Sales price is not greater than $100,000.00;  2) the property is a principal residence of the transferor;  3) the property will be replaced in a like kind 1031 tax deferred exchange; 4) certain foreclosure transactions;  5) seller certifies that the sale will result in a loss for California tax purpose. Non-individual sellers; 1) corporation with a permanent place of business in California; 2) partnership or LLC's; 3) tax exempt entities, insurance companies, IRA's or qualified pension plans; 4) irrevocable trusts with a California trustee; or 5) estates with a California decedent or bank or banks acting as a fiduciary for a trust, may also certify under penalty of perjury that they are not subject to withholding due to one of the exemptions.  The parties acknowledge that escrow holder will take no action regarding withholding without further mutual written instructions of buyer and seller in form satisfactory to escrow, together with completion of Franchise Tax Board forms.
California Revenue and Taxation Code Section 18662 has (as amended by AB2065) require a BUYER of real property to withhold under CAL FIRPTA if the above-described exemptions are not met. Seller or buyer may contact Franchise Tax Board Withholding At Source Unit, P.O. Box 651, Sacramento, CA  95812-0651, (916) 845-6442.

13.  **PRORATIONS:**  Prorate as of Close of Escrow
   •     Real Property taxes based on latest tax bill or on amount furnished by title company.

**To our Escrow Customers:**

**This notification is in compliance with our obligations to comply with federal (and state) law to safeguard your nonpublic personal information.**

**We collect nonpublic personal information about you from the following sources:**

**1)  Information we receive from you on application or other forms;**

**2)  Information about your transactions with us, our affiliates, or others involved in the processing of your transactions; and**

**3)  Information we receive from a consumer reporting agency.**

**We do not disclose any nonpublic personal information about our customers or former customers to anyone, except as permitted by law.**

**We restrict access to nonpublic information about you to those employees who need to know that information to provide products or services to you.  We maintain physical, electronic and procedural safeguards that comply with federal and state regulations to guard your non-public personal information.**

0606

Date: January 19, 2017                                                  Escrow No.: 25616-TC

Page 4 of 5:  Additional instructions made a part of previous pages as fully incorporated therein.

## ADDITIONAL ESCROW CONDITIONS AND INSTRUCTIONS

1.   Your duty to act as escrow holder shall not commence until these instructions, signed by all parties, are received by you.  Until such time either party may unilaterally cancel and, upon written request delivered to you, a party may withdraw funds and documents such party previously handed to you.

2.   All funds received in this escrow shall be deposited with a State or National bank with other escrow funds.  Make disbursements by your check; checks not presented for payment within six months after date are subject to service charges in accordance with your schedule in effect from time to time.  Make all adjustments and proratings on the basis of a 30 day month.  "Close of Escrow" as used in this escrow means the date on which documents are recorded, unless otherwise specified.  All documents and funds due the respective parties herein are to be mailed to the addresses set out below their respective signatures, unless otherwise instructed.  Our signatures on any documents and instructions pertaining to this escrow indicate our unconditional approval of same.  Whenever provision is made herein for the payment of any sum, the delivery of any instrument or the performance of any act "outside of escrow" you as escrow holder shall have no responsibility therefor, shall not be concerned therewith and are specifically relieved of any obligation relative thereto.

3.   You shall not be responsible or liable in any manner whatsoever for the sufficiency or correctness as to form, manner of execution or validity of any documents deposited in escrow, nor as to the identity, authority or rights of any person executing the same, either as to documents of record or those handled in this escrow, nor for forgeries, false impersonations or fraud occurring or perpetrated by any person in connection with this escrow.  Your duties hereunder shall be limited to the safekeeping of such money and documents received by you as escrow holder, and for the disposition of the same in accordance with the written instructions accepted by you in this escrow.  You shall not be required to take any action in connection with the collection, maturity or apparent outlaw of any obligations deposited in this escrow, unless otherwise instructed.

4.   Seller represents and warrants, and you shall be fully protected in assuming that, as to any insurance policy handed you, such policy is in force, has not been hypothecated, and that all necessary premiums therefor have been paid.  You will transmit for assignment any insurance policy handed you for use in this escrow, but you shall not be responsible for verifying the acceptance of the assignment and policy by the insurance company.  ESCROW HOLDER WILL MAKE NO ATTEMPT TO VERIFY THE RECEIPT OF THE REQUEST FOR ASSIGNMENT BY THE ISSUING COMPANY.  You are hereby placed on notice that if the insurance company should fail to receive said assignment, the issuing company may deny coverage for any loss suffered by Buyer.  IT IS THE OBLIGATION OF THE BUYER OR HIS REPRESENTATIVE TO VERIFY THE ACCEPTANCE OF THE ASSIGNMENT OF THE POLICY BY THE ISSUING COMPANY.

5.   Deliver assurances of title, and insurance policies, if any, to holder of senior encumbrance, or his order, or if there be no encumbrances, then to the buyer or his order.

6.   In the event that the conditions of this escrow have not been complied with at the expiration of the time provided for herein, or any extension thereof, you are instructed to complete the same at the earliest possible date thereafter, unless we or either of us has made written demand upon you for the return of the money and/or instruments deposited by either of us, in which case you may withhold and stop all further proceedings in this escrow without liability upon your part for interest on funds held or for damages until written mutual cancellation instructions signed by all parties shall have been deposited in this escrow, whereupon you are then instructed to disburse the escrow funds and instruments accordingly, less your proper charges, to the respective parties hereto whereupon this escrow will without further notice be considered terminated.

7.   NO NOTICE, DEMAND OR CHANGE OF INSTRUCTIONS SHALL BE OF ANY EFFECT IN THIS ESCROW UNLESS GIVEN IN WRITING BY ALL PARTIES AFFECTED THEREBY.  In the event conflicting demands or notices are made or served upon you or any controversy arises between the parties hereto, or with third persons, growing out of or relating to this escrow, you shall have the absolute right to withhold and stop all further proceedings in, and performance of, this escrow, until you receive written notification satisfactory to you of the settlement of the controversy by agreement of the parties thereto, or by final judgment of a court of competent jurisdiction.  All of the parties to this escrow hereby jointly and severally promise and agree to pay promptly on demand, as well as to indemnify you and hold harmless from and against all litigation and interpleader costs, damages, judgments, attorney's fees, expenses, obligations and liabilities of every kind which, in good faith, you may incur or suffer in connection with or arising out of this escrow, whether said litigation, interpleader, obligations, liabilities or expenses arise during the performance of this escrow, or subsequent thereto, directly or indirectly.

8.   You are hereby authorized to deposit any funds or documents handed you under these escrow instructions, or cause the same to be deposited, with any duly authorized sub-escrow agent, subject to your order at or prior to close of escrow, in the event such deposit shall be necessary or convenient for the consummation of this escrow.

9.   All parties agree that as far as your rights and liabilities are involved, this transaction is an escrow and not any other legal relation and you are an escrow holder only on the within expressed terms, and you shall have no responsibility of notifying me or any of the parties to this escrow of any sale, resale, loan exchange, or other transaction involving any property herein described or of any profit realized by any person, firm or corporation (broker, agent and parties to this and/or any other escrow included) in connection therewith, regardless of the fact that such transaction(s) may be handled by you in this escrow or in another escrow.

10.  You are not to be concerned with the giving of any disclosures except as expressly required by Federal or State law to be given an escrow agent.  Neither are you to be concerned with the effect of zoning ordinances, land division regulations, or building restrictions which may pertain to or affect the land or improvements that are the subject of this escrow.

11.  The parties to this escrow have satisfied themselves outside of escrow that the transaction covered by this escrow is not in violation of the Subdivision Map Act or any other law regulating land division, and you as escrow holder are relieved of all responsibility and/or in connection therewith, and are not to be concerned with the enforcement of said laws.

12.  In the event any Offer to Purchase, Deposit Receipt or any other form of Purchase Agreement is deposited in this escrow, it is understood that such document shall be effective only as between the parties signing said document.  You as escrow holder are not concerned with the terms of such document and are relieved of all responsibility in connection therewith.  You are to be concerned only with the directives specifically set forth in the escrow instructions and amendments thereto, and are not to be concerned or liable for items designated as "memoranda" in the within escrow instructions nor with any other agreement or contract between the parties.  You are authorized to furnish copies of escrow instructions, supplements, amendments, or notices of cancellation and closing statements in this escrow to real estate broker(s) and lender(s) referred to in this escrow.  You are not required to submit any title report issued in connection with this escrow to any party or agent unless directed to do so by written mutual instructions.  You may, however, do so without incurring liability to any party for such submission.  You are hereby authorized to submit such report to any prospective lender.

13.  Time is of the essence of these escrow instructions.  In the event of failure to pay fees or expenses due you hereunder, on demand, I agree to pay a reasonable fee for any attorney's services which may be required to collect such fees or expenses.                                    0607

14.  If a party to this escrow unilaterally assigns or orders the proceeds of this escrow, liens of record on the parties to this escrow, such assignment or order shall be subordinated to the expenses of this escrow, liens of record on the subject property, and payments directed to be made by original parties together.  If the result of such assignment or order would be to leave the escrow without sufficient funds to close, then you are directed to close nevertheless, and pay such assignments or orders out of the net proceeds due except for such assignments or orders, and to pay them in the order in which such assignments or orders are received by you.  You are to furnish a copy of these instructions, amendments thereto, closing statements and/or any other documents deposited in this escrow to the lender or lenders and/or the real estate broker or brokers involved in this

Case 5:21-cv-00914-JGB-SHK Document 1 Filed 05/27/21 Page 37 of 46 Page ID #:37

Escrow No.: 25616-TC

Page 5 of 5: Additional instructions made a part of previous pages as fully incorporated therein.

20. Buyer shall deliver to escrow holder a complete Preliminary Change of Ownership Report or Affidavit of Non-Resident Transferee, whichever buyer chooses to provide, pursuant to Revenue and Taxation Code 480.3, which document you are instructed to cause to be delivered to the County Recorder for filing concurrently with the recordation of any document handed you herein effecting a change of ownership.

21. All Parties signatures hereon constitute their knowledge and understanding that Hanmi Escrow Co., Inc. and Nationwide Exchange Corporation are affiliated.

22. Each party signing these instructions acknowledges receipt of a copy of these instructions and states they have read and approved instructions on all previous pages.

HANMI ESCROW CO., INC. IS LICENSED BY THE DEPARTMENT OF BUSINESS OVERSIGHT, STATE OF CALIFORNIA, LICENSE #963-1055.

I/We agree to pay FUNDS REQUIRED TO CLOSE ESCROW UPON DEMAND.

**EACH PARTY SIGNING THESE INSTRUCTIONS HAS READ THE ADDITIONAL ESCROW CONDITIONS AND INSTRUCTIONS CONTAINED HEREIN AND APPROVES, ACCEPTS AND AGREES TO BE BOUND THEREBY. ALL PARTIES SIGNING THIS AGREEMENT HEREBY ACKNOWLEDGES RECEIPT OF A COPY OF THESE INSTRUCTIONS.**

**I/We agree to pay FUNDS REQUIRED TO CLOSE ESCROW UPON DEMAND.**

**BUYERS:**

_____
Mukesh (Mike) Patel and/or Assignee

**CURRENT ADDRESS:**

, , CA, _____

Telephone: _____

The foregoing terms, provisions, conditions, and instructions are hereby approved and accepted in their entirety and concurred in by me. I will hand you necessary documents called for on my part to cause title to be shown as above, which you are authorized to deliver when you hold or have caused to be applied funds set forth above within the time as above provided. Pay your escrow charges, my recording fees, charges for evidence of title as called for whether or not this escrow is consummated, except those buyer agrees to pay. You are hereby authorized to pay bonds, assessments, taxes, and any liens of record, including prepayment penalties, if any, to show title as called for. Affix documentary transfer stamps on deed as required.

**SELLERS:**

Pinnacle Hospitality Inc., a California Corporation

By: _____
    James Choi

**CURRENT ADDRESS:**

, , CA, _____

Telephone: _____

0608

## NOTICE TO BORROWER *IN* SPECIAL FLOOD HAZARD AREA
## NFIP PARTICIPATING COMMUNITY

Borrower:                                                                    Loan #:

Property Location:     **72215 VARNER RD**                    This Notice Date is as of: **01/25/17**
                       **THOUSAND PALMS, CA 92276**

National Flood Insurance Program (NFIP) Community: **RIVERSIDE COUNTY**

We are giving you this notice to inform you that the building or mobile home securing the loan for which you have applied is or will be located in an area with special flood hazards. The area has been identified by the Administrator of the Federal Emergency Management Agency (FEMA) as a Special Flood Hazard Area (SFHA) using FEMA's Flood Insurance Rate Map (FIRM) or the Flood Hazard Boundary Map (FHBM) for the community cited above. FIRMs and FHBMs are prepared by FEMA in cooperation with the applicable community to identify high flood risk and low-to-moderate flood risk areas. The SFHA has at least a one percent (1%) chance of a flood equal to or exceeding the base flood elevation (a 100-year flood) in any given year. During the life of a 30-year mortgage loan, the risk of a 100-year flood in an SFHA is 26 percent (26%).

Federal law allows a lender and borrower jointly to request the Administrator of FEMA to review the determination of whether the property securing the loan is located in an SFHA. If you would like to make such a request, please contact us for further information. Borrowers may also call a FEMA mapping specialist at (877) 336-2627 to discuss their concerns regarding FEMA flood maps.

The community in which the property securing the loan is located participates in the National Flood Insurance Program (NFIP). Federal law will not allow us to make you the loan that you have applied for if you do not purchase flood insurance. The flood insurance must be maintained for the life of the loan. If you fail to renew or maintain flood insurance on the property, Federal law authorizes and requires us to purchase the flood insurance for you at your expense.

- At a minimum, flood insurance purchased must cover the lesser of: (1) the outstanding principal balance of the loan in addition to the aggregate unpaid balance of any superior liens; or (2) the maximum amount of coverage allowed for the type of building under the NFIP; or (3) the insurable value of the building and contents securing the loan. The market value or land value on which the building is located has no bearing on the insurable value of the building. Lenders may require coverage in an amount greater than the minimum. You are encouraged to consider additional flood insurance beyond your lender's requirements including coverage for personal property not securing the loan.

- Federal disaster relief assistance (usually in the form of a low-interest loan) may be available for damages incurred in excess of your flood insurance if your community's participation in the NFIP is in accordance with NFIP requirements. If you are planning to build a structure or make repairs, contact the local community's chief executive official to determine the building standards for structures within an SHFA.

- Although you may not be required to maintain flood insurance on all structures (whether building or mobile home), you may still wish to do so, and your mortgage lender may still require you to do so to protect the collateral securing the mortgage. If you choose not to maintain flood insurance on a structure and it floods, you are responsible for all flood losses relating to that structure.

**Availability of Private Flood Insurance Coverage:** Flood insurance coverage under the NFIP may be purchased through an insurance agent who will obtain the policy either directly through the NFIP or through a Write Your Own (WYO) insurance company that participates in the NFIP. Flood insurance that provides the same level of coverage as an NFIP standard flood insurance policy may be available from private insurers that do not participate in the NFIP. You should compare the flood insurance coverage, deductibles, exclusions, conditions, and premiums associated with flood insurance policies issued on behalf of the NFIP and policies issued on behalf of private insurance companies and contact an insurance agent as to the availability, cost, and comparisons of flood insurance coverage. While flood insurance under the NFIP has been made available in your community, this specific property may not be eligible for NFIP flood insurance due to certain restrictions, such as the designation of the improved property as either Section 1316 under the NFIP or subject to Coastal Barrier Resource Area or Otherwise Protected Area limits.

**Flood Insurance Coverage Subject to Change:** We may assign, sell, or transfer the servicing of your mortgage loan. Your new lender/servicer may require more flood insurance coverage than the minimum amount described above. The new lender/servicer may require coverage in an amount greater than the minimum, and has the right to require flood insurance in an amount equal to 100% of the insurable value of the building(s) used as collateral to secure the loan or the maximum available under the NFIP for the particular type of building. You should review your flood risk with your insurance provider, as you may wish to purchase more coverage than your lender requires.

**Escrow Requirement for Residential Loans:** Federal law may require a lender or its servicer to escrow all premiums and fees for flood insurance that covers any residential building or mobile home securing a loan that is located in an area with special flood hazards. If your lender notifies you that an escrow account is required for your loan now or during the term of the loan, then you must pay your flood insurance premiums and fees to the lender or its servicer with the same frequency as you make loan payments for the duration of your loan. These premiums and fees will be deposited in the escrow account, which will be used to pay the flood insurance provider.

_____  _____     _____  _____
*Borrower/Applicant*                Date         *Borrower/Applicant*                Date

_____  _____     _____  _____
*Borrower/Applicant*                Date         *Borrower/Applicant*                Date

_____  _____     _____  _____
*Borrower/Applicant*                Date         *Borrower/Applicant*                Date

0609

**EXHIBIT "A"**

INVENTORY OF FURNITURE, FIXTURES AND EQUIPMENT OF Red Roof Inn.

and is now located at 72215 Varner Rd.

City of Thousand Palms, County of Riverside, California.

For deposit into Escrow Number 25616-TC

0610

DATED:   May 17, 2017

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

EXHIBIT "C"

# Hanmi Escrow Co., Inc.

**Since 1983**

3130 West Olympic Blvd., Suite 400, Los Angeles, CA 90006
**TEL: (323) 735-4000  FAX: (323) 735-2400**

Tom Cho
Escrow Officer

Date: April 10, 2017
Escrow No.: 25616-TC

## AMENDED ESCROW INSTRUCTIONS

Property Address:      72215 Varner Rd., Thousand Palms, CA 92276

THE ABOVE NUMBERED ESCROW IS HEREBY AMENDED AND/OR SUPPLEMENTED AS FOLLOWS:

(1)     **SUBSTITUTION OF SELLERS:** Escrow Instructions dated January 19, 2017 are hereby amended by substituting **Seoul Plaza, LLC, a Washington Limited Liability Company** hereinafter referred to as "SUBSTITUTE SELLER", as seller in lieu and instead **Pinnacle Hospitality Inc., a California Corporation** hereinafter referred to as "ORIGINAL SELLER", and you are authorized to treat said substitute seller as the seller in lieu of said original seller. The substitute seller, by joining in these instructions, shall be deemed to be a party to said contract to all intents and purposed the same as though they had executed all the contract, escrow instructions and any amendments thereto of the original seller.

ALL OTHER TERMS AND CONDITIONS TO REMAIN THE SAME.

**SELLERS:**
Substitute Seller:
Seoul Plaza, LLC, a Washington Limited Liability Company

By:

By:

**BUYERS:**

Mukesh (Mike) Patel and/or Assignee

Original Seller:

Pinnacle Hospitality Inc., a California Corporation

By:
James Choi

0611

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**EXHIBIT "D"**



# Hanmi Escrow Co., Inc.

3130 West Olympic Blvd., Suite 400, Los Angeles, CA 90006
TEL: (323) 735-4000 FAX: (323) 735-2400

Since 1983

Tom Cho
Escrow Officer

Date: May 31, 2017
Escrow No.: 25616-TC

## AMENDED ESCROW INSTRUCTIONS

Property Address:   72215 Varner Rd., Thousand Palms, CA 92276

THE ABOVE NUMBERED ESCROW IS HEREBY AMENDED AND/OR SUPPLEMENTED AS FOLLOWS:

(1)   The parties agree that the real property is owned by Seoul Plaza, LLC and the business is owned by Pinnacle Hospitality Inc.

ALL OTHER TERMS AND CONDITIONS TO REMAIN THE SAME.

**SELLERS:**

Seoul Plaza, LLC, a Washington Limited Liability Company

By: _____
James E. Choi, Managing Member

**BUYERS:**

MS & Sons Hospitality, LLC, a California Limited Liability Company

By: _____
Mukesh K. Patel, Managing Member

Approved:

Pinnacle Hospitality Inc., a California Corporation

By: _____
James E. Choi, President



# Hanmi Escrow Co., Inc.
3130 West Olympic Blvd., Suite 400, Los Angeles, CA 90006
TEL: (323) 735-4000  FAX: (323) 735-2480

Since 1983

Tom Cho
Escrow Officer

Date: May 25, 2017
Escrow No.: 25616-TC

AMENDED ESCROW INSTRUCTIONS

Property Address:    72215 Varner Rd., Thousand Palms, CA 92276

THE ABOVE NUMBERED ESCROW IS HEREBY AMENDED AND/OR SUPPLEMENTED AS
FOLLOWS:

(1)   Buyers have read and approved the updated preliminary title report dated May 9, 2017 from Stewart
      Title Company, except only the following item(s): 13 & 14 which shall be eliminated.

(2)   Escrow holder shall be concerned with the following proration only: real property taxes & personal
      property taxes

(3)   Owner's Title Policy and the county/city transfer tax shall be based on $6,200,000.00

(4)   Terms of sale are hereby amended as follows:

      $1,200,000.00  Cash Down Payment
      $5,000,000.00  First Deed of Trust

      $6,200,000.00  Total consideration

(5)   New First Deed of Trust to record securing a Note in the amount of $5,000,000.00 in favor of
      Pinnacle Bank.

(6)   Escrow holder shall obtain a standard owner's title policy for Buyer.

(7)   SUBSTITUTION OF BUYERS: Escrow Instructions dated January 19, 2017 are hereby amended by
      substituting MB & Sons Hospitality, LLC, a California Limited Liability Company hereinafter
      referred to as "SUBSTITUTE PURCHASER", as purchaser in lieu and instead Mukesh (Mike) Patel
      hereinafter referred to as "ORIGINAL PURCHASER", and you are authorized to treat said substitute
      purchaser as the purchaser in lieu of said original purchaser. The substitute purchaser, by joining in
      these instructions, shall be deemed to be a party to said contract to all intents and purposed the
      same as though they had executed all the contract, escrow instructions and any amendments
      thereto of the original purchaser. The initial deposit shall be used for the credit of the substitute
      purchaser.

(8)   There will be no other allocation of purchase price through escrow.

(9)   Th parties approve that the interest bearing account was never been opened, since buyer did not
      submit W-9 Form and seller and buyer did not sign the instructions.

(10)  Escrow holder is hereby authorized and instructed to pay hazard insurance premium from Buyer's
      fund at close of escrow, if a bill is presented.

(11)  Buyer and Seller pay their own escrow fees.

(12)  Seller is not selling through 1031 exchange.

(13)  Buyer is not purchasing through 1031 exchange.

(14)  All contingencies in this escrow have been satisfied, removed and/or waived.

(15)  Buyer is made aware that there were some water damage to the hotel caused by a fire hydrant.
      Buyer is further made aware that the Seller currently has a claim open with the seller's insurance
      company.

      Seller agrees to continue with the claim, and complete all work approved from the insurance
      company after close of escrow for which escrow holder shall not be further concerned nor held
      liable.

      Hanmi Escrow Co., Inc. is released of liabilities and responsibilities and is indemnified and held
      harmless in connection with the foregoing including attorneys' fees and costs that may be
      necessary to enforce this indemnity which shall survive the closing of escrow.

(16)  The parties hereby agree that the scheduled closing date of this escrow is hereby amended to be
      on or before May 31, 2017.

Page 2

Date: May 25, 2017                                    Escrow No.: 25616-TC

(17)  **POSSESSION DATE:** The parties agree that the Buyer's date of possession of the subject business is the date the grant deed records (Closing Date).

(18)  **PROFIT AND LIABILITIES FOR SELLER AND BUYER FROM AND THROUGH:** The seller is entitled to all earnings of subject business through and including one day before closing date, and is responsible for all debts and liabilities incurred in connection with subject business through and including one day before closing date. The buyer is entitled to all earnings and profits from and including the closing date, and is responsible for all debts and liabilities incurred from and including the closing date.

(19)  **WITHHOLD SELLER'S PROCEEDS UNTIL RELEASE FROM EDD:** Seller will furnish a CERTIFICATE OF RELEASE from the State of California Employment Development Department. Escrow holder is instructed to withhold the sum of $50,000.00 from Seller's proceeds at the close of escrow until said release has been deposited. In the event said release is not deposited into escrow and escrow holder is in receipt of demand from the above agency, escrow holder is authorized and instructed to pay such demand, on a first-come-first-serve basis, without further instructions to the extent of the amount of the funds withheld. The parties agree that it is seller's sole responsibility to obtain the aforementioned release. In the event funds required to obtain the aforementioned release proved to be more than the funds held by escrow holder, seller shall, if necessary, deposit sufficient funds into escrow to obtain the release.

The amount being held is determined by the parties and as such Seller and Buyer both agree to relieve and hold harmless escrow holder of any liability in the event the amount being held is less than the amount necessary to obtain said releases.

(20)  **AGREEMENT BETWEEN PARTIES CONCERNING THE SEARCHES:** Pursuant to the opening escrow instructions, escrow holder has ordered a UCC Search from the Office of the Secretary of State website and County Recorder. The parties do not require Secretary of State Certification. It has been agreed by and between the parties as follows:

(a).   **FILING WITH SECRETARY OF STATE:** : File #14-7421442140, #08-7145542925 – Secretary of State – shall remain of record after the closing of this escrow. The seller does warrant that the amount due and owing to Bank of Hope the secured party, will be forwarded to the secured party through Title Company. Seller shall cause a termination to be deposited into escrow, after close of escrow.

(b).   **TERMINATION DEPOSITED:** File # 14-7408603172 (Safemark Systems LP)– Secretary of State – The seller warrants that the termination has been deposited into escrow as of this date.

(c).   **ONLY FILING MENTIONED ABOVE & NO NEW FILINGS:** The seller does warrant that the above filing(s) are the only filing(s) of record and that no new filings, including but not limited to UCC filings, federal tax liens, state tax liens, and judgment filings, have been placed with the office of the Secretary of State and/or County Recorder after the opening of this escrow. The buyer does hereby accept the searches in their entirety and the warranties of the Seller. Escrow holder shall not be further concerned with nor liable for the foregoing.

(21)  **ESCROW HOLDER NOT LIABLE FOR FUTURE FILINGS:** Buyer and Seller both agree to relieve and hold harmless escrow holder of any liability due to new future filings which may be place the office of the Secretary of State and/or County Recorder after close of escrow.

(22)  **PERSONAL PROPERTY TAX PAID – PRORATE:** Seller warrants that the 2016-2017 Personal Property Tax Bill has been paid in full, in the sum of $2,952.72 and escrow holder shall prorate same from Buyer's possession to July 1, 2017.

(23)  **PERSONAL PROPERTY TAXES :** The buyer acknowledges that the county personal property taxes will be billed in the name of the seller, seller having been the owner of record as of the lien date on January 1, of this current year. However, since the taxes will be for the fiscal year beginning July 1, 2017, and ending June 30, 2018, all of which will follow buyer's possession, buyer will be responsible for the entire taxes billed and warrants to pay the prior to the delinquent date and to hold the seller harmless of and from any liability for the same.

(24)  The parties represent that the parties will obtain the approval from the franchisor outside of escrow. Escrow holder shall not be further concerned with nor liable for the foregoing. Hanmi Escrow Co., Inc. is released of liabilities and responsibilities and is indemnified and held harmless in connection with the foregoing including attorneys' fees and costs that may be necessary to enforce this indemnity which shall survive the closing of escrow.

(25)  Assumption of the alarm contract, if applicable, shall be handled outside of escrow. Escrow holder shall not be further concerned with nor liable for the foregoing.

(26)  Escrow holder shall be concerned only with the prorations set forth in these closing instructions.

**0601**

Page 3

Date: May 25, 2017

Escrow No.: 25616-TC

(27)  **CLOSE ESCROW:** All other terms and conditions of the escrow agreement have been completed and complied with insofar as the escrow holder is concerned and you are hereby authorized and instructed to close this escrow as soon as practical.

ALL OTHER TERMS AND CONDITIONS TO REMAIN THE SAME.

**SELLERS:**

Seoul Plaza, LLC, a Washington Limited Liability Company

By: _____
James E. Choi, Managing Member

**BUYERS:**
Substitute Purchaser:
MS & Sons Hospitality, LLC, a California Limited Liability Company

By: _____
Mukesh K. Patel, Managing Member

Original Purchaser:
_____
Mukesh (Mike) Patel